**COPEASE MANUFACTURING CO., Inc., Plaintiff,**

v.

**AMERICAN PHOTOCOPY EQUIPMENT CO., a partnership; Samuel G. Rautbord, a partner; and American Photocopy Equipment Company, an Illinois corporation, Defendants.**

**COPEASE MANUFACTURING CO., Inc., Plaintiff,**

v.

**PORAY, INC., Defendant.**

Civ. A. Nos. 55C550, 55C2179.

United States District Court
N. D. Illinois, E. D.

Nov. 29, 1960.

**536**

E. M. Luedeka, Soans, Anderson, Luedeka & Fitch, Lloyd C. Root, Chicago, Ill., and Curtis, Morris & Safford, Edward G. Curtis, Arthur V. Smith and Wm. C. Conner, New York City, for plaintiff.

Richard R. Wolfe, Franklin M. Crouch, Wolfe, Hubbard, Voit & Osann, Thompson, Raymond, Mayer, Jenner & Bloomstein, Albert E. Jenner, Jr., and John J. Crown, Chicago, Ill., for defendants.

MINER, District Judge.

This matter having been fully tried before the Court, and the Court having read the pleadings filed herein by the respective parties, and the Court having heard and examined all the testimony, documents and exhibits presented by the respective parties and admitted into evidence, and the Court having considered the evidence so presented and admitted at the separate trial on the so-called "fraud" issue as well as that at the final trial on the remaining issues, and the Court having read, heard and considered the briefs, memoranda and oral arguments submitted by counsel in support of their respective positions, and the Court being fully advised, the Court hereby enters its Findings of Fact and Conclusions of Law as follows:

Findings of Fact

*The Actions*

1. The present actions, consolidated for trial, are for infringement of claims 1–6 and 9–11, inclusive, of United States Letters Patent Number 2,657,618, entitled "Developing Apparatus", issued November 3, 1953, to Walter Eisbein of Stuttgart, West Germany, on an application filed April 17, 1950. Plaintiff has abandoned its charges of infringement of claims 6, 9, and 10, leaving in issue claims 1–5, inclusive, and 11.

*The Parties*

2. Plaintiff in both actions, Copease Manufacturing Co., Inc., is a Delaware corporation organized November 16, 1954, and has its principal place of business in New York, New York. Plaintiff is, and has been since its inception, engaged solely in the business of granting licenses under the patent in suit.

Civil Action 55 C 550

3. Defendant American Photocopy Equipment Co., a partnership, had its principal office and place of business at Chicago, Illinois. It ceased business operations in January 1954, and contemporaneously conveyed its assets to defendant American Photocopy Equipment Company, an Illinois corporation, formed in January 1954, shortly before the aforesaid conveyance of partnership assets.[1]

4. Defendant Apeco, the corporation, has its principal office and place of business within the Northern District of

1. These defendants, where appropriate, will be jointly referred to as "Apeco in these Findings and Conclusions.

Illinois. It succeeded to the business of the partnership defendant.

5. Defendant Samuel G. Rautbord, a resident of the Northern District of Illinois, was the sole general partner of the partnership defendant and is president and one of the principal stockholders of the corporate defendant.

### Civil Action 55 C 2179

6. Defendant Poray, Inc., the sole defendant in this action, is an Illinois corporation having its principal office and place of business in the Northern District of Illinois.

### The Acquisition of Patent in Suit

7. Plaintiff acquired the patent in suit from the patentee Eisbein by written assignment dated November 16, 1954, pursuant to an agreement dated August 14, 1953. The assignment does not expressly convey any choses in or rights of action for damages or right to sue in respect of any act of infringement that might have occurred prior to the date of the assignment. However, the agreement does expressly contemplate assignment of the right to sue for any asserted infringement of this or any other U. S. patent issued to Dr. Eisbein or to Develop, k. g., a partnership of which Dr. Eisbein was one of three partners.

### The Process

8. The device of the patent in suit and the accused machines comprise developing appartus designed primarily for use in connection with the development step of a photocopying method known as the diffusion-transfer-reversal process. In a generalized way, this process includes two steps: the exposure to light of the photosensitive emulsion on a "negative" sheet, and the development of the negative with transfer of the image to a "positive" sheet.

In the usual method of effecting the *first* step, the original sheet to be copied is placed in face-to-face contact with the photosensitive negative sheet coated on one side with an emulsion layer containing a dispersion of silver halide grains, with the "copy" side of the original in contact with the emulsion side of the negative. Light is directed through the back of the negative sheet against the "copy" side of the original. The light reflected from the original back onto the negative exposes the latter to form in its emulsion a latent image consisting of a pattern of exposed silver halide grains. This latent image or pattern of exposed silver halide grains is a reversed or "mirror" image of the original, due to the face-to-face relation of the two sheets during the time of the exposure to light.

After this exposure operation, the original and negative are separated, the original having no further function in the process. The *second* step requires that the negative sheet be moistened with a processing liquid and pressed face-to-face against the positive sheet, which may also be moistened. This latter is coated on its face with a non-photosensitive emulsion which contains specks of metallic silver or the like to serve as precipitation nuclei (in effect, catalysts) to induce reduction of unexposed silver halide grains on the negative sheet. The negative and positive sheets, when pressed together after moistening, tend to adhere one to the other. The sheets are left in contact for approximately ten to forty seconds. When peeled apart, a positive image formed by chemical action appears on the positive sheet. The quality of the positive image depends, among other things, on the quality and contents of the processing liquid, that of the chemical emulsions on the sheets, the exposure time, and the time during which the sheets remain in contact. A waiting period is necessary in order to develop a visible or patent transfer image on the positive sheet.

9. The processing liquid contained within the developing machines contains both a developing agent and a silver halide solvent. When the negative sheet or both negative and positive sheets are immersed in the processing liquid, the developing agent reduces the silver halide grains in the exposed areas of the emulsion (*corresponding to the light back-*

ground areas of the original) while leaving the unexposed portions of the negative (corresponding to the dark printed matter of the original) unaffected. When the moistened sheets are pressed together in face-to-face relation, the silver halide solvent in the processing solution dissolves the unexposed grains of silver halide and causes them to be diffused from the emulsion of the negative into that of the positive, where the developer acts with the assistance of the "catalyst" to reduce these unexposed grains to metallic silver, producing blackened areas corresponding to the dark areas of the original and produce a positive copy of the original. The second "mirror" reversal produced by this face-to-face transfer operation makes this a "rectified" or readable copy.

*Prior Photocopying Methods*

10. Prior to about 1949, the best known commercial method of document copying was the so-called "wet" process. This process was essentially nothing more than conventional photography. After the sheet of "negative" paper had been exposed to the original document to be copied, it was separated from the original and placed into a first tray of developer liquid for approximately 30 seconds, then into a second tray containing water and washed for at least 30 seconds to remove the developer. Then it was placed into a third tray containing a "fixing" solution or silver halide solvent for at least five minutes, and into a fourth tray of water where it was washed again for at least five to ten minutes. When the negative was removed from the last washing tray it was dripping wet and had to be dried for approximately five minutes, depending upon the type of drying equipment employed. This entire operation thus took approximately twenty minutes and produced only a negative copy.

To produce a positive copy, the entire process had to be repeated, that is, a new sheet of photosensitive paper had to be exposed to the negative and then developed, washed, fixed, washed again and dried. Thus the production of a positive copy required a total time on the order of forty minutes.

The "wet" process had the further disadvantage of requiring a darkroom, since the exposure, developing and washing steps and at least the first portion of the fixing step had to be performed in substantial darkness. Moreover, the process required open trays of liquids which may be damaging to clothing fabrics and irritating to the skin. Finally, the process required skill and experience. It was unsuitable as a general office photocopying process. For this reason, it was performed almost exclusively by commercial organizations such as blueprint and photostat companies.

*History of the Process*

11. The record in these proceedings indicates that both Dr. Edith Weyde of the German photographic firm I. G. Farbenindustrie Aktiengesellschaft, commonly known as AGFA, and Andre Rott of the Belgian photographic firm known as Gevaert, claimed to have originated the diffusion-transfer-reversal process in about 1940.

12. AGFA filed patent applications on this process in a number of countries, the first application being filed in Germany in January, 1941. The first of the AGFA patents on the diffusion process to issue was Norwegian Patent No. 66,994, which was published in October, 1943.

Gevaert filed applications for patent on the Rott work in a number of countries, the first of such applications being filed in Great Britain on November 23, 1939. The first Gevaert patent to issue was the French patent which was granted June 30, 1941. The corresponding U. S. Patent No. 2,352,014 was issued June 20, 1944.

13. Both the AGFA and the Gevaert patents had been reviewed in U. S. technical publications as early as 1947. During World War II, Gevaert manufactured and sold under the name "Transargo" some papers and chemicals for use in the process. While these materials could be, and were, to the limited extent of their distribution, used in the process,

there is some evidence that their use did not produce high quality photocopies.

14. Prior to 1949, the process had had no appreciable impact in the office photocopying field. Among the principal reasons for this was lack of a suitable apparatus to enable unskilled and inexperienced personnel to operate the development-diffusion-transfer step of the process with consistently good results.

*AGFA Developing Apparatus*

15. In her experimental work in connection with the transfer process, Dr. Weyde had originally performed the development-diffusion-transfer operation by wetting the positive and negative sheets and pressing them in face-to-face relation on a glass plate by means of a hand roller.

16. Subsequently, Dr. Weyde used a pair of rollers constructed in the AGFA shop after the fashion of a washing machine wringer. However, when these sheets emerged from between the rollers they were almost invariably wrinkled or creased.

The wringer-roller laboratory device employed by Dr. Weyde was crude. It consisted of a manually operated set of ordinary wringer-rollers fixed in horizontal position (flat) across, flush to and between two fixed horizontally placed boards supported by a frame and legs to form a rough table. The sheets of wet paper were sought to be introduced into the device by the operator holding them between and separated by the fingers. They were held in a vertical position above the rollers and then aimed and lowered manually down to the bite of the rollers which were operated by a hand crank. In a second operation these rollers were cranked, the sheets passed through the rollers, and the operator had to reach under the boards beneath the rollers and retrieve the sheets. There were no guides of any kind. The wringer-rollers were not precisely geared nor designed for the particular purpose for which they were sought to be employed.

17. As a result of her experience with these rollers, Dr. Weyde and her superior, Dr. Leubner, concluded that it was not feasible to perform the development-diffusion-transfer step in the process by pressing the two sheets together between a pair of rollers having contact along substantially a single line only, but that in order to prevent creasing and wrinkling the negative and positive sheets should be pressed together over a large area at the same time.

18. AGFA devised and constructed a developing machine to accomplish the object of keeping the two sheets under pressure throughout a substantial area. This AGFA machine consisted of a liquidtight casing in which processing liquid was held at a given level. A large roller or revolvable drum and three smaller rollers were mounted within the casing. About the rollers was a series of endless rubber belts arranged edge-to-edge to form in effect a single, wide belt. This belt extended slightly more than half way around the under portion of the large roller-drum and was supported and tensioned by the three smaller rollers which were arranged in the liquidtight casing to press the belt against the large roller-drum.

The casing included a removable lid which when in place rendered the casing a single enclosed unitary structure. In the sloping face of the lid were three horizontal, parallel, offset, inlet slots through each of which a sheet to be processed could be inserted into the liquidtight casing. On the inner surface of the lid, between and along the sides of the slots, were guide wires which were end-mounted so as to project inwardly into the liquidtight casing for guiding the sheets downwardly and separately into the developer liquid to the point of tangency of the belt and the large roller-drum. The guides between the slots insured that the sheets would be separated one from another from the entrance slots in the lid and down into the processing liquid to permit the liquid to flow between the sheets and wet their chemical coatings before they reached the bite of the belt and large roller-drum which was below the surface of the liquid.

The positive and negative sheets, after having been moistened, passed between the belt and the large roller-drum where they were pressed together and excess processing liquid squeezed out. After passing between the large roller-drum and the belt the sheets were stripped from the roller-drum by stripper fingers and ejected through a fourth slot in the top of the lid of the liquidtight casing.

19. The ends of the downwardly protruding guide wires extended toward and, depending upon the amount or level of liquid in the casing, would be either submerged or not submerged in the liquid. The bite of the belt and large roller-drum was sufficiently below the bottom level of the guide wires so that for a number of levels of liquid in the casing the bite would be beneath the surface and the ends of the guide wires above the surface of the liquid. The machine was ordinarily operated with a liquid level above the bite of the belt and roller-drum but below the ends of the guide wires. However, there is some indication that the machine would operate as satisfactorily with a liquid level high enough to submerge a portion of the guide wires in the liquid.

20. The AGFA developing machine was believed by AGFA personnel to be inappropriate for commercial production and general office use because of its large size, its large liquid capacity and frequent need for adjustment of the belts and rollers. Such adjustments were required because sheets sometimes tore due to lateral creepage of the belts along the supporting rollers.

21. The AGFA developing device is the subject of French Patent No. 879,995. All of its elements are disclosed in that patent except the guide wires described above in Finding No. 18. No evidence was introduced here concerning whether or not the guide wires were actually disclosed during the prosecution of the French patent proceedings.

*Conception of the Patented Invention*

22. On February 23, 1949, at its Leverkusen, West Germany plant, AGFA held a meeting at which its version of the process and its machine were demonstrated by Dr. Edith Weyde. Members of the German Association of Manufacturers of Document Photocopying Equipment were invited and representatives of a number of such manufacturers were present at the meeting. The patentee, Walter Eisbein, was present as representative of his company, Trikop, GmbH, of Stuttgart.

23. At the said meeting, Doctors Weyde, Leubner, Prill and Uhl of AGFA provided those in attendance with detailed information about both the process and the various laboratory developing devices they had employed, including the hand roller, hand-cranked wringer-roller device and the machine.

24. The AGFA developing machine was examined thoroughly, inside and out, by the persons present at the Leverkusen meeting, including Dr. Eisbein.

25. Following the demonstration, the companies represented were invited to undertake the design and conception of a suitable commercial machine for performing the developing-transfer step of the diffusion-transfer-reversal process. Representatives of four manufacturers, including Dr. Eisbein, agreed to attempt to accomplish that object. May 1 1949 was set as the deadline for the four companies to submit to AGFA their respective machine designs.

26. Dr. Eisbein gained his knowledge of the diffusion-transfer-reversal process at the Leverkusen meeting. He had nothing to do with the development of the process.

On February 23, 1949, the day of the Leverkusen meeting, while going home on the train from Leverkusen, Dr. Eisbein sketched the machine he would build. About a week after the meeting, Dr. Eisbein received from AGFA a drawing showing the structure of the AGFA apparatus, including a representation of the wire guiding members.

*The Eisbein Device*

27. Within a week of the meeting Dr. Eisbein had constructed his first model. He used aluminum. This device cor-

responded to that shown in Fig. 3 of the patent in suit except that it was constructed of aluminum which was found to corrode when in contact with processing liquid and lacked the motor and stripper fingers.

28. By letter dated March 1, 1949, AGFA advised Dr. Eisbein of materials that would not be corroded by the processing liquid. Dr. Eisbein then substituted plastic for aluminum and by March 25, 1949, had completed and tested the reconstructed device. No significant changes were made in the construction. By the middle of June, 1949, Dr. Eisbein had substituted a motor for the earlier handcrank to turn the rollers, had added stripper fingers like those of the demonstrated AGFA machine, and had demonstrated his machine to the AGFA executives in Leverkusen.

29. None of the other three companies which had undertaken to design a machine ever submitted a machine design to AGFA.

30. The Eisbein device has a plurality of rigid, perforated, superposed, plastic, curved guide plates which dip down into the processing liquid in the bottom of a liquidtight casing and extend through the liquid up to a pair of rollers. Sheets of photocopy paper are pushed along the guide plates which engage and guide the outsides of the sheets down into and through the developer liquid, and up to the rollers. The rollers engage the sheets, press them together, draw them from the bath and eject them from the casing.

31. The early devices made by Dr. Eisbein would on occasion crease and wrinkle the sheets. There is no evidence that creasing and wrinkling occurred in Dr. Eisbein's later models. Defendant does not contend, and no evidence has been introduced to show, that both the early and the later models were not made in accordance with the specifications, or failed to satisfy the limitations of the claims, of the patent in suit.

2. This Finding and Findings of Fact numbered 33 to 41, inclusive, repeat, in substance, the facts found by the Court in ,

*The Patent Office Proceedings*

32. The application which ripened into the patent in suit was filed in the United States Patent Office on April 17, 1950. In the first Patent Office Action of October 20, 1950, the Patent Office rejected all 23 claims as unpatentable over two patents previously issued to Moss and Hoops. In the next Office Action of December 10, 1951, the Patent Office again rejected all claims on the Hoops patent and a patent issued to Fullerton.[2]

33. Dr. Eisbein then added Claim 24 to his application by Amendment B, and in this amendment as well as in subsequent Amendment C and Amendment D, he contended that his Claim 24 was distinguishable over the Moss, Hoops and Fullerton patents by reason of his guide means which extend between the paper strips (and thereby engage the *insides* of the strips).

34. In the Office Action dated July 3, 1952, the Examiner stated that "Claims 2, 24 and 26 appear to be allowable as presently advised." Up to and including this Office Action, the Examiner had not cited the French patent 879,995, although the application expressly refers to and explains the "photo-mechanical reproduction process such as is described in French Patent No. 879,995."

35. Dr. Eisbein's attorney, Mr. Jennings Bailey, Jr., then had an oral interview before the Examiner, at which time the Examiner first manifested his awareness of the pertinency of the AGFA French patent and advised Mr. Bailey that the French patent apparatus, described at lines 33 to 104 of page 3 and lines 31 to 68 of page 4 of the French patent, may anticipate Claim 24. The Examiner further suggested that Eisbein "might avoid" the French patent "by suitably modifying the claim to bring in the fact" that Eisbein had "actual guides on the *outside* of each strip" (emphasis added).

36. On October 2, 1952, Mr. Bailey wrote to Dr. Eisbein's German patent at-

its memorandum dated September 1, 1959.

torney, Dr. Kohler, informing the latter of the Examiner's opinion that the French patent "anticipates Claim 24" and of the Examiner's suggestion for avoiding rejection on that ground. Mr. Bailey requested Dr. Eisbein's comments.

In his answering letter of October 7, 1952, Dr. Kohler pointed out to Mr. Bailey that the machine shown in the AGFA French patent "differs quite essentially" from the Eisbein machine. He further pointed out what he considered to be a number of differences between the two machines, concluding, "I hope you will be able to use these arguments for the defense of the application." However, Dr. Kohler also added that "The clarification requested by the Examiner seems to be unobjectionable."

37. Accordingly, by Amendment "F", Claim 24 was amended by adding the words:

"* * * said guiding means including means extending between strips guided therein including means extending from such opening to a point adjacent the rolls for engaging and guiding the outsides of strips separated by said last means."

In the "Remarks" of Amendment F, it was noted that the Examiner "felt that Claim 24 might conceivably be technically readable" on the French patent and it was further stated:

"The claim has therefore been amended to bring out clearly that applicant has means which engage the outsides of the strips between the opening and a point adjacent the rolls so as to give positive guiding of the strips through this area."

38. Dr. Eisbein's Amendment G, later filed, makes a minor correction not material to the issues now before the Court, and on March 27, 1953, the Patent Office issued a Notice of Allowance informing Dr. Eisbein that his application had been allowed. The patent issued on November 3, 1953.

39. Claim 24 of the patent application is Claim 1 of the patent as issued. The said Claim 1 of the patent as issued incorporates the matter added by Amendment "F" in the words:

"* * * said guiding means extending between strips guided therein and including means extending from such opening to a point adjacent the rolls for engaging and guiding the outsides of strips separated by said last means * * *"

40. Plaintiff, in response to defendants' request to admit certain facts, has stated that:

"The machine which AGFA disclosed and demonstrated to the members of the Photocopy Manufacturers' Association at Leverkusen on February 23, 1949 had means which engaged the outside of the paper sheets between the inlet opening of the apparatus and the point adjacent the solution level so as to give positive guiding of the paper sheets through this area."

41. The only difference between the French patent and the actual demonstrated apparatus is that the patent shows a separating shaft which constitutes guide means engaging only the insides of the strips, whereas the demonstrated apparatus has the four series of wire members which guided the strips by engaging their outsides as well as their insides.

42. Dr. Eisbein at no time apprised the Patent Office that the AGFA machine which was constructed in accordance with the French patent, demonstrated to and examined by him, included the wire guide members.

*Commercial Acceptance of Patented Machine*

43. Beginning in October 1949, Dr. Eisbein's company commenced the sale of machines of the type disclosed in the patent in suit. From May 1953, to date, the machines made by Develop have been sold in the United States by Copease Corporation. Copease Corporation sold 7200 of these machines in the United States by the end of 1959, for a sales volume of approximately two million dol-

lars in machines alone, exclusive of the paper and chemicals sold for use therein.

44. The patent in suit has been generally respected. Six United States companies have taken licenses to make and/or sell photocopying machines under it.

*The Patent Claims*

45. Claims 1 and 5 of the patent in suit are independent. The remaining claims 2, 3, 4 and 11 are dependent on claim 1.

46. All the claims in issue require:

(a) liquidtight casings, since the independent claims recite "a casing adapted to hold developer liquid" (claim 1, column 4, at lines 33–34), and "a casing for holding developer liquid" (claim 5, column 4, at lines 67–68);

(b) "contacting rollers within" the casing, as recited in independent claims 1 and 5 (column 4, lines 36–37 (claim 1) and 71–72 (claim 5)); and

(c) "guiding means" within the liquidtight casing, as provided for in independent claims 1 and 5 (column 4, line 37 (claim 1) and column 4, lines 72–75, column 5, lines 1–8 (claim 5)).

47. All the claims in issue require guiding means for guiding at least two strips of paper from the inlet opening in the casing down into and through the devolper liquid to the bite of the contacting rollers including a separator for and between the strips. For claims 1, 2, 3, 4 and 11 this is recited as:

"guiding means * * * including means extending from such opening to a point adjacent the rolls for engaging and guiding the outsides of strips * * *" (claim 1, column 4, lines 44–47).

For claim 5 this requirement is recited as:

"a plurality of spaced fixed substantially parallel guiding means forming at least two superposed curved slideways * * * leading from said opening to under the surface of the liquid and then to the set of rollers * * *" (claim 5, column 4, line 72 through column 5, line 2).

48. Claims 1, 2, 3, 4 and 11 define the patented combination as:

"a device for developing exposed photographic sheet material and for simultaneously transferring an image onto an unexposed transfer sheet by moistening the material with a developer liquid and by subsequently pressing the materials into contact one with another." (claim 1, column 4, lines 27–32).

Claim 5 defines this more simply as:

"a device for developing reproductions of the character described * * *" (claim 5, column 4, lines 66–67).

49. Dependent claims 2, 3 and 4 require in addition to the combination of elements of claim 1:

"a member removable from the casing," (claims 2 and 4, column 4, lines 52–53 and lines 62–63),

or

"a frame removably suspended within the casing" (claim 3, column 4, lines 56–57).

This "member" or "frame" carries the rollers, bearings and gearing for the rollers.

50. Dependent claim 11 requires in addition to the combination of elements of claim 1 that the:

"contacting portions of [the] rollers are at a level normally above the surface of the liquid." (claim 11, column 6, lines 5–7).

*Comparison of AGFA'S Demonstrated Device and the Patented Device*

51. Generally the operation and functions of the machine defined by the patent claims in suit are the same as those of the AGFA machine demonstrated at the Leverkusen meeting. Both machines (a) hold liquid in a liquidtight casing, (b) have means to keep the strips of paper separate from one another for the wetting of their chemical coatings, (c) have means to guide the two separated strips of paper one above the other into

the liquid as the initial step in their travel through the liquid to the pressing mechanism, (d) have means to press the wet sheets together, and (e) eject the pressed-together sheets from the casing.

52. The elements of the patent in issue which were also present in the demonstrated AGFA machine are:

(a) a casing for holding developer liquid at a given level,

(b) a set of guides for both guiding the outsides of sheets of paper into the developer liquid, and for maintaining them separate from one another down into the liquid to permit access of liquid between them.

53. The elements of the patent in issue which were not also present in the demonstrated AGFA machine are:

(a) a set of guides, however formed (claim 1), or in the form of "superposed curved slideways" (claim 5), which, in addition to the functions stated in Finding 52(b) above, guide the sheets *through* the liquid to the bite of the rollers.

(b) contacting rollers which press the wet sheets together along a line without the use of belts.

54. The bite of the pressing mechanism of the demonstrated AGFA machine is located under the surface of the processing liquid. The bite of the pressing mechanism of both the patented devices and the accused devices demonstrated to the court is located above the surface of the processing liquid.

*APECO Enters the Field*

55. Prior to 1952 APECO was engaged in the manufacture and sale of equipment and supplies for making photocopies according to the old "wet" process. It first learned of the diffusion process of photocopying in the early part of 1950 when one of its employees saw an advertisement of the Eisbein machine in a Swiss newspaper. APECO immediately initiated correspondence about the machine with the Swiss advertiser.

56. The partnership defendant was also contacted about the German machines by a different source, Dr. Boeger

k. g. of Hamburg, Germany, who manufactured a small hand-operated developing machine known as the "Copyfix". Mr. Fred Carstens, an export agent for Dr. Boeger, brought one of the "Copyfix" machines to the United States in May, 1950, and at the invitation of the defendant Rautbord, brought the machine to Chicago and demonstrated it extensively for defendant Rautbord and the other APECO personnel.

57. Defendant Rautbord expressed a strong interest in obtaining exclusive sales rights to the machine and paper for the United States. He questioned Carstens about the U. S. patent situation, about the Develop machine made in Stuttgart, and about the contractual relations, if any, which existed between Develop and Dr. Boeger k. g., but Carstens did not have any of this information.

58. While in defendant Rautbord's office, Mr. Carstens telephoned Dr. Boeger k. g. in Hamburg and was informed that Dr. Boeger k. g. and Develop had "joint patent" rights in the machines.

During this telephone conversation Mr. Carstens ordered on behalf of APECO an additional supply of AGFA paper and processing chemicals. Shortly after the conversation, defendant Rautbord sent a cable to Dr. Boeger ordering in addition one of the "Develop" machines as made by Dr. Eisbein's company in Stuttgart. All of these materials, including the Develop machine, were received by APECO around the first part of June 1950.

When he returned to Germany, Mr. Carstens left the "Copyfix" machine with APECO.

59. Defendant Rautbord negotiated to obtain for APECO exclusive rights in the United States both as to the machines and as to the paper. During the course of these negotiations, defendant Rautbord was notified about the filing of the application for the U. S. patent in suit and of its serial number and filing date.

60. As early as May or June 1950, defendant Rautbord employed a consult-

ing engineer, Mr. Manfred J. Pollak, to design for APECO a developing machine for the diffusion process. For Mr. Pollak's guidance in this work, defendant Rautbord turned over to him all of the data he had obtained in connection with the German machines, including the machines themselves.

*The Accused Machines*

61. On January 30, 1952, APECO commenced the sale of its "Autostat" developing machine.

In 1953, APECO commenced the sale of the same "Autostat" developer unit in combination with an exposure device under the joint name "Systematic Autostat". The exposure unit was so constructed that the developer unit sat on top of it to form, at least in visual appearance, a single unit.

Commencing in 1954 and continuing to date, APECO has sold the "Dial-A-Matic" machine, having exposure and developing units within a single housing.

From 1957 to date, APECO has sold the "Unimatic" machine, which includes both exposure and developer sections, and in which the sheets pass directly from the exposure section into the developer section without leaving the machine.

From 1958 to date, APECO has sold the "Director" machine which, like the "Dial-A-Matic", has exposure and developer sections within a single housing, but with separate input and output slots for each section.

62. Each of the APECO machines satisfies the limitations of Claims 1, 2, 3, 4, 5 and 11 of the patent in suit.

63. Defendants have questioned the application of these claims to the APECO machines in only two respects:

(a) Defendants contend that the APECO machines are not devices for "developing exposed photographic sheet material and for simultaneously transferring an image onto an unexposed transfer sheet material by moistening the materials with a developer liquid and by subsequently pressing the materials into contact one with another" as called for in Claim 1 and in each of its dependent Claims 2, 3, 4, and 11; and

(b) Defendants contend that the APECO machines do not have "a casing adapted to hold the developer liquid therein at a given level" as called for in Claims 1 and 5.

64. In the APECO machines, as in the machine described and claimed in the patent in suit, the development step commences upon immersion of the positive and negative sheets into the processing liquid and continues even after the sheets have emerged from the machine and have been separated, so long as there are any unreduced exposed silver halide grains in the negative and so long as it is moistened by unexpended developer.

The transfer of the unexposed silver halide grains (the incipient positive image) from the negative to the positive commences at the instant when the two sheets are pressed together between the rollers and continues until the two sheets are peeled apart.

During at least the latter portion of the period when the two sheets are in contact, the formation of the visible positive image is also taking place.

Thus, during the interval of time when the negative and positive sheets are in contact, the development of the negative and the transfer and formation of the positive image are all taking place simultaneously. The preamble of Claim 1 therefore aptly describes the APECO machines.

65. It is clear from a reading of the entire patent in suit that the intention was to refer in the preamble of Claim 1 to the diffusion process as described and covered in the AGFA patent and as used in the APECO machines.

66. In the patented machine, the outer housing is made liquidtight so that it also serves as the tank, whereas in the APECO machines there is a removable tank for holding the liquid, the tank being fully enclosed and supported by the outer housing. Defendants have merely divided into two parts that which the patent discloses as being made in a

single part, without any substantial change in the function of the machines.

67. Each of the APECO machines includes "a casing adapted to hold the developer liquid" as called for in Claims 1 and 5 of the patent.

68. The APECO machines and the patented machine perform substantially the same function in substantially the same way to produce substantially the same result, and are full equivalents.

69. APECO was advised by its own attorneys that at least some of the claims of the patent in suit were readable upon the APECO machines.

70. Defendants' infringement of the patent in suit was and is wilful and wanton.

*Other Prior Art*

71. United States Patent No. 858,023 granted to Post in 1907 teaches that a wringer-roller arrangement may be substituted for a belt and roller arrangement in making copies by pressing moistened sheets together and that each is the equivalent of the other.

72. The use of wringer-rollers in connection with the diffusion-transfer-reversal photocopying process was a commonly accepted use as disclosed by the prior publications. This use is taught in United States Patent Nos. 2,500,421 and 2,435,717 to Land, which are among the patents for the Polaroid-Land camera and the diffusion-transfer-reversal process which it employs, and in the PSA Journal, Volume 13, January 1947.

In the field of photography generally wringer-rollers for pressing together and squeezing two or more wet sheets of photographic material to effect image transfer from one to another had been a common expedient as shown by The Complete Photographer, Vol. 3 (1942), at page 931, and Photographing in Color (1940), at page 127.

73. The use of wringer-rollers in direct contact for pressing together two sheets of moistened paper to effect image transfer from one to another of the sheets was an obvious expedient both for photographic and duplicating purposes generally and for the specific diffusion-transfer-reversal process at the time Dr. Eisbein conceived and built his first machine. This use rebuts any novelty or contribution in the patent in suit.

74. United States Patent No. 717,021 granted to Pollak in 1902 illustrates and describes, *inter alia*, the fixing bath portion of a photographic developing machine which portion has (1) a liquid-tight casing designed to hold liquid, (2) curved, superposed, substantially parallel, guide ribs forming a guide passage for guiding short strips or sheets of photographic material down into, through and out of the liquid to (3) a pair of contacting squeegee wringer-rollers whose point of tangency is above the level of the liquid for squeezing the sheets emerging from the liquid, for effecting image transfer from one sheet to the other.

75. The diffusion-transfer-reversal process can be performed using the fixing bath device of the 1902 Pollak patent with either manual separation or a separator.

76. The use of a casing designed to hold liquid, guides either straight or curved with a center separator, and a pair of contacting pressing wringer-rollers to effect image transfer from one sheet of paper to another was an obvious expedient in the light of the Pollak prior art patent and the instructions for carrying out the diffusion-transfer-reversal process given to Dr. Eisbein by AGFA.

AGFA suggested to and instructed Dr. Eisbein to maintain the sheets separate to permit processing liquid to wet the chemically coated sides of the sheets. The actual AGFA machine had separator guide wires. The separator was not original with the patentee.

77. The structure defined in the claims of the patent in suit is disclosed and anticipated by the machine illustrated and described in United States Patent No. 381,226 granted to Edwards in 1888. This patent shows a device for passing metal sheets through a liquid and squeezing them upon emerging from the liquid. The Edwards device has a

.casing for holding liquid at a given level, a plurality of superposed guideways which are substantially parallel and curved for guiding the sheets into and through the liquid to the nip of the rollers. The rollers are above the liquid and mounted on a frame which is removable from the casing.

78. The machine of the Eisbein patent in suit would have been obvious to one skilled in the art at the time it was first made by the patentee. Every element of the Eisbein machine was old and functions in that machine in its usual manner. No new coaction between the elements takes place nor is any unobvious result achieved. It is anticipated by the prior art. It does not meet the standard of invention required by the Patent Statute.

79. During the prosecution of the application for the patent in suit, the United States Patent Office did not have before it, know of, or consider, the demonstrated AGFA machine with its liquid-tight casing, roller-belt arrangement, separator and guides for engaging and guiding the outsides of separated strips in paths down into and through developer liquid in the casing to the bite of the belt and large roller, which structure was shown to and inspected by the patentee, Dr. Eisbein, at the outset. The Patent Office did not have before it the teachings by others prior to the patentee of the use of squeegee wringer-rollers in the diffusion-transfer-reversal process and in photographic and duplicating equipment.

The Patent Office record does not show any prior disclosure of the combination of a (1) casing, (2) curved guideways, and (3) wringer-rollers as taught by the prior art and pointed out for the first time by defendants in these proceedings.

Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of these actions.

2. Plaintiff has the right to sue for all acts of infringement committed after issuance of the patent in suit.

3. Claims 1, 2, 3, 4, 5 and 11 of United States Letters Patent No. 2,657,618 fail to define patentable invention and are invalid.

4. The presumption of validity arising from the grant of a patent does not exist as against prior art not before the Patent Office. Except where otherwise noted hereinbefore, none of the prior art adduced in evidence by the defendants was before the Patent Office in the prosecution proceedings respecting United States Letters Patent No. 2,-657,618.

5. United States Letters Patent No. 2,657,618 is a combination patent consisting of old elements no one of which standing alone is patentable.

6. A combination patent employing old elements is patentable only when the combined elements produce a new and unobvious result. The structure defined by Claims 1, 2, 3, 4, 5 and 11, or any of them, of United States Letters Patent No. 2,657,618 is no more than an aggregation of separate elements and produces no new, unobvious result.

7. Except for the determination of invalidity set forth in Conclusion of Law No. 3, defendants and each of them have infringed Claims 1, 2, 3, 4, 5 and 11 of Patent No. 2,657,618 by making, using and/or selling without the consent of plaintiff, machines for developing photocopies, as defined in each of said claims, within the Northern District of Illinois.

8. Defendants having prevailed on the issue concerning validity of the patent here involved, the Complaints and Amended Complaints in Civil Actions 55 C 550 and 55 C 2179 must be dismissed and judgment on the merits be entered for defendants.

9. The Court having determined that defendants acted wilfully and wantonly, with total disregard and in defiance of prevailing moral and ethical business standards; that defendants deliberately copied and imitated plaintiff's construction; and that such actions

**548**

would have entitled plaintiff to prevail in this suit if the patent here sued upon had been valid, the Court denies costs of suit to defendants and further denies the motion of defendants to allow and assess attorneys' fees pursuant to Title 35, U. S. Code, Section 285.