COPEASE MANUFACTURING CO., Inc.
and American Photocopy Equipment
Co., Plaintiffs,

v.

CORMAC PHOTOCOPY CORPORATION,
Anken Chemical and Film Corporation,
Ampto, Inc., Ampto Equipment Corpo-
ration, F. G. Ludwig, Inc., Transcopy,
Inc., and Gull Manufacturing Co., Inc.,
Defendants.

United States District Court
S. D. New York.

June 25, 1965.

As Amended July 27, 1965.

William C. Conner, (of Curtis, Morris & Safford), New York City, for plaintiffs. Garo A. Partoyan, New York City, of counsel.

William K. Kerr (of Fish, Richardson & Neave), New York City, for defendants. Roger R. Phillips, New York City, of counsel.

GRAVEN, Senior District Judge (by assignment).

This action involves the validity of United States Patent No. 2,657,618 for a "Developing Apparatus" issued on November 3, 1953, to Walter Eisbein of Stuttgart, Germany, the claimed infringement of that patent, and questions connected therewith. The plaintiff American Photocopy Equipment Company is the present owner of the patent in suit. The plaintiff Copease Manufacturing Company, Inc., although a nominal party to the action, has no present interest in the patent and did not participate in the trial. The defendant Anken Chemical and Film Corporation is a New Jersey corporation. The defendants Ampto, Inc., Ampto Equipment Corporation, F. G. Ludwig, Inc., Transcopy, Inc., and Gull Manufacturing Company, Inc. are its affiliates. The defendant Anken Chemical and Film Corporation acquired certain of the assets of the defendant Cormac Photocopy Corporation, a New York corporation, on or about March 1, 1961. The defendant Cormac Photocopy Corporation, although a party to the action, did not participate in the trial of this action. The defense of this action was conducted entirely by the defendant Anken Chemical and Film Corporation.

The primary issues are whether the Eisbein patent is valid and whether it has been infringed by any of the defendants. A subsidiary issue is whether the defendant Anken Chemical and Film Corporation is liable for the claimed infringement of the patent by the defend-

ant Cormac Photocopy Corporation prior to the time the former acquired certain assets of the latter.

This same patent has been the subject matter of other litigation. Copease Mfg. Co. v. American Photocopy Equipment Co. (D.C.N.D.Ill.1960), 189 F.Supp. 535, reversed on appeal (7th Cir., Dec. 26, 1961), 298 F.2d 772; American Photocopy Equipment Company v. Ampto, Inc. (Feb. 20, 1964), 82 N.J.Super. 531, 198 A.2d 469; petition for certification denied by New Jersey Supreme Court (1964), 42 N.J. 291, 200 A.2d 125; petition for certiorari denied (1964), 379 U.S. 842, 85 S.Ct. 80, 13 L.Ed.2d 47. The background of the patent is set forth in the opinions in the cases referred to.

The patent relates to the making of photocopies of documents for general office use. Prior to 1949 the best known method of making photocopies was the so-called wet process which, in essence, was conventional photography applied to documents. In the wet process a photosensitive sheet of negative paper was first exposed to the document to be copied and then it was successively introduced into three, or sometimes four, separate trays containing different solutions for developing, washing and fixing. It was preferable that equipment be available for drying. The process was such that photocopying was done mostly by professional service companies and was used very little in offices for general copy work. In about 1939 Dr. Edith Weyde of the German photograph firm of Aktiengesellschaft Fuer Fotoindusterie, commonly known and referred to as AGFA or Agfa, and Andre Rott of the Belgian firm Gevaert, each acting independently, invented what is known as the diffusion-transfer-reversal process and the DTR process. The DTR process involves two steps. The exposure step is the same as in the wet process and exposes the photo-sensitive emulsion on the negative sheet of the document to be copied. The second step is the development and transfer step in which the exposed negative is wetted in a processing liquid which contains developer and fixer. In the case of

Copease Mfg. Co. v. American Photocopy Equipment Co. (7th Cir.), 298 F.2d 772, p. 774, footnote 4, the process is described more in detail as follows:

"In the usual method of effecting the first step the original sheet to be copied is p'aced in face-to-face contact with the photosensitive negative sheet coated on one side with an emulsion layer containing a dispersion of silver halide grains, with the 'copy' side of the original in contact with the emulsion side of the negative. Light is directed through the back of the negative sheet against the 'copy' side of the original. The light reflected from the original back onto the negative exposes the latter to form in its emulsion a latent image consisting of a pattern of exposed silver halide grains. This latent image or pattern of exposed silver halide grains is a reversed or 'mirror' image of the original, due to the face-to-face relation of the two sheets during the time of the exposure to light.

"After this exposure operation, the original and negative are separated, the original having no further function in the process. The second step requires that the negative sheet be moistened with a processing liquid and pressed face-to-face against the positive sheet, which may also be moistened. This latter is coated on its face with a nonphotosentitive emulsion which contains specks of metallic silver or the like to serve as precipitation nuclei (in effect, catalysts) to induce reduction of unexposed silver halide grains on the negative sheet. The negative and positive sheets, when pressed together after moistening, tend to adhere one to the other. The sheets are left in contact for approximately ten to forty seconds. When peeled apart, a positive image formed by chemical action appears on the positive sheet. The quality of the positive image depends, among other things, on the quality and contents

of the processing liquid, that of the chemical emulsions on the sheets, the exposure time, and the time during which the sheets remain in contact. A waiting period is necessary in order to develop a visible or patent transfer image on the positive sheet.

"The processing liquid contained within the developing machines contains both a developing agent and a silver halide solvent. When the negative sheet or both negative and positive sheets are immersed in the processing liquid, the developing agent reduces the silver halide grains in the exposed areas of the emulsion (corresponding to the light background areas of the original) while leaving the unexposed portions of the negative (corresponding to the dark printed matter of the original) unaffected. When the moistened sheets are pressed together in face-to-face relation, the silver halide solvent in the processing solution dissolves the unexposed grains of silver halide and causes them to be diffused from the emulsion of the negative into that of the positive, where the developer acts with the assistance of the 'catalyst' to reduce these unexposed grains to metallic silver, producing blackened areas corresponding to the dark areas of the original and produce a positive copy of the original. The second 'mirror' reversal produced by this face-to-face transfer operation makes this a 'rectified' or readable copy."

Following her discovery of the process, Dr. Weyde did considerable experimental work for AGFA in connection with the process. In that connection she designed and caused to be constructed a large machine which employed a large drum with an endless belt extending around most of the periphery of the drum for holding the positive and negative sheets together under pressure throughout substantially their entire area during their movement beneath the developer liquid. Following the discovery of the process by Dr.

Weyde, AGFA filed patent applications on the process in a number of countries. The first application was filed in Germany in 1941. The first AGFA patent to be issued was Norwegian Patent No. 66,994 which was published in October, 1943. Following the discovery of the process by Andre Rott, the Gevaert firm filed applications on the process in a number of countries. The first Gevaert patent was a French patent issued June 30, 1941. The corresponding United States Patent No. 2,352,014 was issued June 20, 1944. In years prior to 1949 the process was discussed in some technical journals. However, the process was not used commercially to any substantial extent until 1949. On December 10, 1942, the AGFA firm was issued French Patent No. 879,-995 on its developing device. The AGFA firm did not regard the machine designed by it as being acceptable for general office use. AGFA was not particularly interested in going into the production of photocopy machines using the diffusion transfer process. Its primary interest and concern was in the production and sale of photographic paper and supplies. It was, therefore, willing that others would undertake the designing of a machine using the diffusion transfer process which would be acceptable for general office use in the photocopy field. To that end AGFA invited a number of German manufacturers of photographic equipment to meet at its plant in Leverkusen, Germany, on February 23, 1949. A considerable number of them accepted the invitation. At that meeting AGFA demonstrated the process using the large machine it had designed. Following the demonstration, AGFA asked the companies represented to undertake the designing of a developing machine which would make the diffusion transfer process available and acceptable for general office photocopy work. Dr. Walter Eisbein attended the meeting. He represented a comparatively new company named Trikop and later Develop. Four of the companies represented at the meeting indicated that they would undertake to design the kind of machine desired. One of those companies was Dr. Eisbein's

company. Immediately following the meeting, Dr. Eisbein devoted himself to the problem. The first working model of a machine designed by him was completed by the end of March, 1949, and was demonstrated to the AGFA officials around the middle of June, 1949. The AGFA officials were pleased with the machine. They regarded it as being an excellent machine. Tests made by them indicated to them that the machine was "foolproof." Following this demonstration, AGFA called another meeting of German manufacturers of photography equipment on June 29, 1949. The machine developed by Dr. Eisbein was favorably regarded by those attending the meeting. Dr. Eisbein applied for and received patents in fifteen countries for his invention. On April 17, 1950, Dr. Eisbein filed an application for an United States Patent, and on November 3, 1953, Patent No. 2,657,618 was issued to him which is the patent in suit.

The litigation relating to this patent has had some interesting features. By an assignment dated November 16, 1954, the Copease Manufacturing Company, a Delaware corporation, acquired the Eisbein patent. In 1955 it brought an action in the United States District Court for the Northern District of Illinois in which the American Photocopy Equipment Company was charged with the infringement of the patent. In that litigation the American Photocopy Equipment Company contended that the patent was invalid. On October 10, 1957, the Copease Manufacturing Company instituted the present action in this District against the defendant Cormac Photocopy Corporation, charging it with infringement of the patent. On December 26, 1961, the United States Court of Appeals for the Seventh Circuit held that the patent was valid and that the American Photocopy Equipment Company had infringed it. The adverse decision subjected the American Photocopy Equipment Company to accountability for an apparently large amount of infringement damages. Thereafter on June 18, 1962, the American Photocopy Equipment Company, at the cost of around five and one-half mil-lion dollars, acquired the capital stock of the Copease Manufacturing Company, Inc. and the Eisbein patent. On September 18, 1962, the American Photocopy Equipment Company was added as a plaintiff to the present action and the Copease Manufacturing Company, Inc. thereafter had the status of being merely a nominal party.

In the meantime, in March, 1961, the Anken Chemical and Film Corporation had acquired certain assets of the Cormac Photocopy Corporation which originally was the only defendant in the present action. On March 22, 1962, the Anken Chemical and Film Corporation was made a party defendant to the present action and thereafter the Cormac Photocopy Corporation had the status of a nominal defendant. Thereafter, the other defendants who were affiliates of the Anken Chemical and Film Corporation were added as parties defendant. Thus, the present action finally developed into litigation between the American Photocopy Equipment Company on the one hand and the Anken Chemical and Film Corporation on the other. For convenience, the American Photocopy Equipment Company will be referred to as the plaintiff and the Anken Chemical and Film Corporation as the defendant. The American Photocopy Equipment Company in this action asks to have declared as valid the same Eisbein patent that it asked to have declared as invalid in the Illinois litigation. In 1959 the Copease Manufacturing Company, Inc. brought an action in the Superior Court of New Jersey against the Anken Chemical and Film Corporation and its affiliates, Ampto, Inc. and Ampto Equipment Corporation, to recover royalties claimed to be due under a license agreement relating to the Eisbein patent. The action was subsequently withdrawn without prejudice as to Anken Chemical and Film Corporation and Ampto Equipment Corporation but was continued as to Ampto, Inc. Later the American Photocopy Equipment Company was substituted as the plaintiff in that action in lieu of Copease Manufacturing Company, Inc. In that action Ampto defended on the

claim for royalties, among other grounds, on the ground that the photocopy machine it made or sold did not embody the invention of the Eisbein patent and therefore did not come within the obligating terms of the license agreement. However, that action did not involve the validity of the patent. The trial (Superior) court held for Ampto. On appeal to the Appellate Division of the Superior Court that holding was reversed and, as heretofore noted, the New Jersey Supreme Court refused certification and the United States Supreme Court denied petition for certiorari.

There will next be referred to the claims of the Eisbein patent here involved and certain statements appearing in the patent application.

On page 1 of the patent the following statements appear:

"The present invention relates to improvements in a device for developing photographic or photomechanical reproductions.

"The device in accordance with the invention is primarily suited for carrying out a photo-mechanical reproduction process such as is described in French Patent No. 879,-995. In such process, a negative image is first produced from an original image upon a coated carrier, the coating of which contains not only light sensitive material but also contains materials for a developing and fixing process. The negative is then simultaneously developed and fixed and a positive image transferred to a copying material provided with an image receiving coating by wetting both the coated carrier and the copying material with a liquid which activates the developing and fixing materials and pressing the coated carrier and the copying material together with their coatings face to face.

"The primary object of the present invention is to provide a device which will automatically carry out the process outlined above. The device in accordance with the invention can, however, also be used for other processes in which appropriate negative material coated with a sensitized layer which has already been subjected to a photo-mechanical exposure but not as yet developed and other coated material are to be wetted with a liquid and pressed together with their coatings face to face. The device may furthermore be employed for developing coating carriers wherein an image is not transferred to another carrier.

"It is a special object of my invention to provide a device capable of carrying through the aforementioned processes in a practical and simple way within the least amount of time while producing good results.

"With the above and other objects in view which will appear as the description proceeds, this invention resides in the novel construction and arrangement of parts substantially as hereinafter described and more specifically defined by the appended claims. It is to be understood, however, that such changes in the precise embodiment of the herein disclosed invention may be made as come within the scope of the claims.

"* * * *."

On page 3 of the patent the following statements appear:

"While the device has been shown with only one pair of rollers, obviously a plurality of pairs of rollers arranged in series could be provided therein without departing from the scope of the invention.

"The device, for example, can be employed to transfer a positive image from two non-developed but exposed negatives (obtained in the usual way) onto the two sides of a double coated photo copypaper. For this purpose the two negatives are placed layer to layer with the double coated positive paper. In this position all three papers are inserted into the feeder path, so that the first negative will slide with its coated

side pointing downwardly between the guiding plates 5 and 6, the double coated paper between plates 6 and 7, and the second negative, its coating pointing upwardly between plates 7 and 8. The off-set arrangement of the slide ways considerably facilitates the simultaneous insertion of the three coated sheets. The sheets are thereupon pushed in together until they reach the motor driven rollers 14 which will draw them in. On their way to the rollers the coated carriers are wetted by the liquid in the casing, as a result of which, the chemical elements contained in the paper coatings are activated. The corrugations 12 and the openings 11, provided in the slide ways 5, 6, 7, 8 permit the coatings to be wetted on all sides. The corrugations 12 serve to prevent possible sticking of the wetted copy papers. The transfer of the negative image onto the positive paper takes place during the passage of the sheets through the rollers. The rollers at the same time serve to press out any excess liquid absorbed by the coated carriers, so that they come off the rollers almost dry."

The claims of the patent here involved are claims 1, 5 and 11. Those claims are as follows:

"1. A device for developing exposed photographic sheet material and for simultaneously transferring an image on to an unexposed transfer sheet material by moistening the materials with a developer liquid and by subsequently pressing the materials into contact one with another, said device comprising a casing adapted to hold the developer liquid therein at a given level, and having an opening therein above such level, an arrangement of contacting rollers within the casing, and guiding means within the casing adapted to guide a plurality of strips in paths from said opening to the point of tangency of the rollers, at least one of said paths extending below the level of the liquid in the casing, said guiding means being constructed and arranged to allow access of liquid to at least one of said strips, and said guiding means extending between strips guided therein and including means extending from such opening to a point adjacent the rolls for engaging and guiding the outsides of strips separated by said last means for preventing contact between the strips at least in the portion of the path between the opening and a point adjacent the level of the liquid.

"5. A device for developing reproductions of the character described which comprises a casing for holding developer liquid, an opening in said casing above the level of the liquid for the insertion of sheet material to be treated, a set of rollers comprising at least one pair of contacting rollers within said casing and a plurality of spaced fixed substantially parallel guiding means forming at least two superposed curved slide ways communicating with said liquid leading from said opening to under the surface of the liquid and then to the set of rollers for feeding at least two sheets of material inserted into the opening simultaneously and in superposed relationship through the liquid and then to the set of rollers, said guideways including means extending between and separating strips therewithin during at least a part of their travel therethrough.

"11. A device according to claim 1 in which the contacting portions of said rollers are at a level normally above the surface of the liquid."

In their briefs the parties discuss the decision of the United States Court of Appeals for the Seventh Circuit in which the patent in suit was held valid and infringed and the decision of the Appellate Division of the Superior Court of New Jersey. The defendant cites a number of cases in which a particular patent was held valid in one appellate jurisdic-

tion and was held to be invalid by a court in another appellate jurisdiction. The parties are in agreement that a decision as to a patent in one appellate jurisdiction is not necessarily determinative when a similar question in regard to the same patent is being considered by a court in another appellate jurisdiction. They are also in agreement that a decision from another appellate jurisdiction relating to a patent is to be considered from the viewpoint of persuasiveness. It is the contention of the plaintiff that the decision of the United States Court of Appeals for the Seventh Circuit relating to the validity of the patent in suit is very persuasive. It is the contention of the defendant that the decision is lacking in persuasiveness. It is the contention of the plaintiff that the decision of the Appellate Division of the New Jersey Superior Court so far as it relates to certain issues in the present case is also very persuasive. It is also the contention of the plaintiff that the decision of the Appellate Division of the New Jersey Superior Court operates as a collateral estoppel against the defendant in the present case and is binding on it. It is the contention of the defendant that the United States Court of Appeals for the Seventh Circuit is lacking in persuasiveness because that Court did not properly evaluate the prior art. It is the further contention of the defendant that the decision of that Court is lacking in persuasiveness in that certain prior art is before the Court in the present action which was not before the Court in the Seventh Circuit case.

The prior art introduced into evidence in the present case will next be considered. That art consisted of the following:

Drawing of Agfa Machine

Agfa French Patent 879,995

Koch patent 2,384,626

Barrett patent 829,193

Dreyfus patent 1,783,606

Philips' French Patent 891,502

Pollak patent 717,021

Singer patent 2,553,014

Handbuch der Photokopie (Dr. Arpad von Biehler) p. 83

"One Step Photographic Processes" by Lloyd E. Varden PSA Journal, Vol. 13, Sept. 1947, pp. 551–554

Land patent 2,435,719

It was heretofore noted that the claims of the patent here in issue are claims 1, 5 and 11. Claims 1 and 5 are primary claims. Claim 11 is a dependent claim. Claims 1 and 5, in substance, relate to a mechanical device having three primary parts: (1) a liquid tight casing; (2) guides for guiding two or more sheets of emulsified photocopy paper into and through a developer liquid in that casing; and (3) a pair of wringer-rollers located in that casing for squeezing the sheets of photocopy paper together after they had been wetted in their passage through the liquid.

The AGFA machine and its related French patent would seem to be the most pertinent on the matter of prior art since that machine was designed expressly for the purpose of performing the diffusion transfer process discovered by Dr. Weyde. The Eisbein patent makes express reference to the French AGFA patent. The AGFA machine, as heretofore noted, was designed to develop a photocopy by keeping the positive and negative sheets under pressure throughout a substantial area. The machine had a liquid type casing in which the developer liquid was held at a given level. A large drum and three smaller rollers were maintained within the casing. About the rollers was a series of endless rubber belts arranged to form, in effect, a single, wide belt. This belt extended slightly more than half way around the under portion of the large roller drum and was supported and tensioned by the three smaller rollers which were arranged so as to press the belt against the large roller drum. The casing had a removable lid. In the sloping face of the lid were three horizontal, parallel, offset inlet slots through each of which the sheets to be processed could be inserted into the casing. The machine, but not the French patent, provided for guide

wires which were end mounted so as to project inwardly into the casing for guiding the sheets downwardly and separately into the developer liquid to the point of the tangency of the belt and the large roller drum. The positive and negative sheets, after having been wetted in the liquid, passed between the belt and the large roller drum where they were pressed together and the excess processing liquid squeezed out. After passing between the large roller drum and the belt, the sheets were stripped from the roller drum by stripper fingers and ejected from a fourth slot at the top of the casing.

There are differences in the disclosures of the AGFA machine and patent and the disclosures of claims 1 and 5 of the Eisbein patent. Claim 1 of the Eisbein patent calls for an "arrangement of contacting rollers." Claim 5 of that patent calls for a "set of rollers comprising at least one pair of contacting rollers." No such arrangement of rollers or set of rollers is disclosed by either the AGFA machine or the AGFA patent, nor does either of them disclose any type of mechanism intended to function in the same way. In the AGFA machine and patent the drum and belt are intended to press the sheets together beneath the liquid and to hold them together for the greater part of their passage through the liquid. In the Eisbein machine the line of the rollers is above the level of the liquid, so the sheets are not pressed together until they have passed completely through the liquid and have emerged from it. Claims 1 and 5 of the Eisbein patent call for a guiding means. The AGFA machine has several short wires which have been heretofore referred to. Those wires do not appear in the drawing of the machine in the AGFA patent. Those wires do insure that the sheets are guided in normal, straight paths downwardly from the inlet slots in the cover toward the space between the roller drum and the endless belt and to that extent furnish a form of "guiding means." However, they do not "guide a plurality of strips in paths * * * extending below the level of the liquid in the casing," nor are they

"constructed and arranged to allow access of liquid to at least one of said strips" therein as required by claim 1. They are located entirely above the liquid. Further, the wires do not form "curved slide ways" covers and are different from the "guiding means" called for in the Eisbein patent claims. Those wires do not "guide a plurality of strips in paths * * * extending below the level of the liquid in the casing" as required by claim 1 of the Eisbein patent, nor are they "constructed and arranged to allow access of liquid to at least one of said strips" therein as further recited in claim 1. They are located entirely above the liquid. Moreover, the wires do not form "curved slide ways communicating with said liquid" as required by claim 5, nor do they convey the sheets "through the liquid and then to the set of rollers" as further recited in claim 5.

The drum and belt arrangement of the AGFA machine had disadvantages. The creepage of the belt lengthwise of the rollers sometimes caused the sheets to be creased and even torn. The large drum and multiplicity of rollers for supporting the endless belt necessitated frequent adjustments by a skilled mechanic. The AGFA firm did not regard its machine as being acceptable for general office use. It never went much beyond the laboratory stage. It performed a different sequence of operations from that to be performed by a machine designed in accordance with the Eisbein patent.

The next prior art to be considered is the Pollak United States Patent No. 717,021 issued on December 30, 1902. That relates to a machine for developing and the processing of a single sheet of conventional photographic film or paper. The patent discloses two tanks arranged in a series with three pairs of rollers. The single sheet or strip first passes between one pair of rollers, then into a developing tank, then between the second pair of rollers, then into a fixing tank, and then between a third pair of rollers. The disclosure of that patent does not have to do with a process in which two sheets of material are pressed together.

The patent does not contain any disclosure as to feeding two sheets simultaneously and in superposed relation through a developer liquid as specified in the Eisbein patent claims. The patent does not contain any disclosure of a separator means for preventing contact between a pair of sheets until they enter a developer liquid as specified in the Eisbein patent claims.

The next prior art to be considered is Land United States Patent No. 2,435,719 issued February 10, 1948. That patent relates to the well-known Polaroid-Land camera which is shown in another Land United States Patent which was issued the same day. The structures disclosed by Land do not disclose any container for holding developer liquid at a given level as specified by the claims of the Eisbein patent. Neither do they disclose any fixed guide means for conveying sheets into, through and out of a liquid as specified by the claims of the Eisbein patent. The paper in the Land Camera is not wet, so that Land does not teach a solution to the problem of differential expansion and consequent wrinkling of wet, adhering sheets nor any other problem involved in making use of the diffusion transfer process performed in office photocopy machines.

The AGFA machine, the AGFA French patent, the Pollak patent, and certain of the Polaroid-Land patents were considered by the United States Court of Appeals for the Seventh Circuit in its decision. That Court held that they did not anticipate the invention disclosed by the Eisbein patent.

There will next be considered other prior art which was either not introduced into evidence in the Seventh Circuit case or, if introduced into evidence, was not discussed by the Court of Appeals.

Koch United States Patent No. 2,384,626 issued September 11, 1945, relates to a machine for the carrying out of a process in which printing ink or other matter is transferred from two sides simultaneously to opposite sides of a receiving sheet. The patent shows and describes a pair of pressure rollers for bringing the sheets into contact to accomplish the transfer. The rollers described in the Koch patent are not "contacting" rollers as specified in the claims of the Eisbein patent. Further, the rollers are used in a different manner than are the rollers of the machine disclosed in the Eisbein patent. Under the Koch patent, the sheets are passed between the rollers on a steel plate to which they are secured by a clamping bar. The sheets to be used in connection with the Koch patent are not wet and, therefore, do not deal with the problem of wrinkling or creasing due to differential expansion of wet, adhering sheets.

Barrett United States Patent No. 829,193 issued August 21, 1906, relates to a process for reproducing an original sheet by transferring printed materials from one sheet to another. It shows and describes a pair of pressure rollers for pressing the sheets into face-to-face contact to establish the transfer. The sheets are fed into the rollers sandwiched between strips of celluloid. The Barrett patent does not relate to a photographic process or any other process involving wet, adhering sheets and thus does not teach a solution to the problem sought to be solved by the Eisbein invention.

Dreyfus United States Patent No. 1,783,606 was issued December 2, 1930. It relates to a process for printing fabric by transferring dye from a transfer sheet to the fabric and shows and describes the use of a pair of pressure rollers to bring the sheets into intimate contact to accomplish the transfer. The patent discloses the use of a pair of rollers to press two strips together. The strips are made of fabric. Although one of the strips is sprayed with solvent, it is dried to remove surplus liquid before passing between the rollers and the two strips are separated immediately after passing between the rollers. The Dreyfus patent does not teach the use of rollers in a process involving wet, adhering sheets such as is taught by the Eisbein patent.

Philips' French Patent No. 891,502 issued December 11, 1943, relates to a device for developing a single heliographic

or photographic sheet. It shows and discloses a pair of co-acting rollers which wet the sheet and transport it through the device. It shows and discloses the use of a pair of rollers in a photographic process. Under the Philips' patent only one sheet is fed between the rollers at a time. The apparatus described in that patent includes a funnel which serves as a form of guiding means to conduct the sheet between the rollers. However, this guiding means is dissimilar to the guiding means disclosed by the Eisbein patent. The funnel is located entirely outside of the liquid and the sheet is dry during its entire passage through the funnel and until it reaches the rollers. The rollers are partially immersed in tanks which contain ordinary water and serve the purpose of wetting the single sheet rather than pressing together and partially drying a pair of sheets as disclosed by the Eisbein patent. It is obvious that an apparatus constructed in accordance with the disclosures of the Dreyfus patent could not be used in the diffusion transfer process.

Singer United States Patent No. 2,-553,014 issued May 15, 1951, relates to a machine for the processing of a single sheet of photographic paper. It shows and discloses a developing section of a machine which includes a casing containing the developer liquid, an U-shaped guide means which extends from the inlet side of the tank at a point above the liquid level to a pair of rollers which convey the sheet through the liquid. As noted, the patent relates to an apparatus for the developing and fixing of a single strip or sheet of photographic film or paper. It contains no separator means for separating two sheets until they enter the processing fluid. It is obvious that an apparatus constructed in accordance with the disclosures of the Singer patent could not be used in the diffusion transfer process.

In von Biehler's "Handbuch der Photokopie," published in Germany in 1948, there is shown a machine for developing a single sheet of photographic paper. The machine has an open casing containing developer liquid with rollers at the input and output ends positioned above the level of the liquid and means to guide them through and out of the liquid to a roller arrangement which carries the sheet through and out of the machine. The defendant suggests that the machine could be used for the diffusion transfer process by feeding only the negative sheet between the input rollers while simultaneously inserting the positive sheet into the open top of the tank. It would appear that it would be extremely difficult to get the leading edges of both the roller-driven negative sheet and the hand-fed positive sheet to arrive at the output rollers at the same instant so that the sheets would be pressed together in proper register. The author does not suggest any such use.

The Varden article, "One Step Photographic Processes," appeared in the September, 1947, issue of the PSA Journal. It discusses the diffusion transfer process as disclosed by the Agfa and Gevaert patents which had been previously issued. The author suggested (p. 551) that the positive and negative sheets, after being soaked in the developer solution, may be "brought in intimate contact by squeegeeing." This apparently refers to placing the two sheets face-to-face upon a backing plate and pressing them by a hand operated roller. Dr. Weyde, in her experimental work, had tried something similar and found it unsatisfactory. The author stated (p. 553) that the sheets could also be pressed together by "a suitable system of rollers * * * described in the Norwegian Patent." The Norwegian patent was another Agfa patent corresponding to the Agfa French patent. The "system of rollers" referred to is obviously the drum and endless belt arrangement of the experimental Agfa machine which, as heretofore noted, failed to function satisfactorily.

It appears, and this Court so finds, that no one of the prior art exhibits introduced into evidence anticipated the complete assemblage disclosed by the Eisbein patent. However, it is clear that on the matter of anticipation all of the prior art must be considered as a

whole. Section 103, Title 35, U.S.C.A., provides, in part:

"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *."

■■ The complete assemblage disclosed by the Eisbein patent has three primary elements. Those elements are (1) a liquid-tight casing; (2) guides for guiding two or more sheets of emulsified photocopy paper into and through the liquid contained in the casing; and (3) a pair of wringer-rollers for squeezing the sheets of paper together after they have been wetted in passing through the liquid. It appears, and this Court so finds, that the device disclosed by the Eisbein patent is a combination of those elements. It appears, and this Court so finds, that each of those elements is old. Therefore, the assemblage disclosed by the Eisbein patent consists of a combination of old elements. It appears, and this Court so finds, that such combination was not disclosed by any one of the prior art exhibits introduced into evidence. However, under Section 103, Title 35, U.S.C.A., above set forth, patentable invention is not disclosed by a patent disclosing a combination of old elements where the prior art relating to the subject matter as a whole is such that the combination disclosed would have been obvious to a person having ordinary skill in the art. This phase leads into a very troublesome and somewhat murky field of law.

■■ It is well known that patents generally, and especially patents based upon a combination of old elements, have fared badly as to the matter of their validity following the decision of the United States Supreme Court in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. (1950), 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. In that case the Court stated (p. 152 of

340 U.S., p. 130 of 71 S.Ct.) : "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." The Court also stated (p. 151 of 340 U.S., p. 129 of 71 S.Ct.) :

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549 [58 S.Ct. 662, 664, 82 L.Ed. 1008] : 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * *."

In 1952 the Congress revised the patent laws. In connection with that revision it enacted what now appears as Section 103, Title 35, U.S.C.A. The pertinent portion of that Section has been heretofore set forth. There has been a diversity of attitudes by the United States Courts of Appeal as to the effect upon the matter of patentable invention by the enactment of Section 103. Some of those Courts have continued to follow the strict rule relating to patents and especially combination patents apparently laid down in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra. Other of those Courts have seemed to have followed a more liberal rule relating to the validity of patents generally and combination patents in particular. So far as this Court is concerned, the authoritative decisions, until the United States Supreme Court makes a more definite pronouncement, are the decisions of the United States Court of Appeals for this Circuit. In 1955 that Court decided the case of Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, certiorari denied (1955), 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799. In that case there was involved the validity of a patent relating to a method of applying films of inorganic salts on the surfaces of optical instruments. The

validity of the patent was upheld. The opinion was written by Judge Learned Hand. In that opinion it was stated that the patent would have been invalid under the standard of invention prevailing twenty-five or thirty years ago and would have been invalid had the case arisen in the years more immediately preceding the enactment of Section 103 of the Patent Act in 1952. It was the view of the Court that by the enactment of Section 103 Congress intended to depart from the stricter standards of recent years and restore the earlier less strict standards. That Court has continued to follow the rationale of that case. Reiner v. I. Leon Co. (1960), 285 F.2d 501, certiorari denied (1961), 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388. See also Norman v. Lawrence (2d Cir. 1960), 285 F.2d 505. In the case of Copease Mfg. Co. v. American Photocopy Equipment Co., supra, in which the Court of Appeals for the Seventh Circuit held the patent in question valid, it cited the case of Reiner v. I. Leon Co., supra, and quoted from the opinion in that case.

While the United States Court of Appeals for this Circuit follows the more liberal rule as to the matter of patentable invention and while the United States Court of Appeals for the Seventh Circuit appears to have followed the liberal rule of the Court of Appeals for this Circuit in upholding the validity of the patent in case, it is not certain what rule will be followed by the United States Supreme Court. For about fourteen years following its decision in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., and during all of the years subsequent to the enactment of Section 103, Title 35, U.S. C.A., the United States Supreme Court invariably denied all petitions for certiorari in cases which involved the question of patentable invention. However,

on January 18, 1965, 379 U.S. 956, 85 S.Ct. 652, 13 L.Ed.2d 553, it granted certiorari in the case of John Deere Company of Kansas City v. Graham (8th Cir. 1964), 333 F.2d 529. In that case the United States Court of Appeals for the Eighth Circuit invalidated a patent which had been held valid by the United States Court of Appeals for the Fifth Circuit. The United States Court of Appeals for the Eighth Circuit is regarded as following the strict rule as to patentable invention, while the United States Court of Appeals for the Fifth Circuit is regarded as following the more liberal rule. On March 29, 1965, the United States Supreme Court granted certiorari in two cases. It granted certiorari (380 U.S. 949, 85 S.Ct. 1082, 13 L.Ed.2d 967) in the case of Calmar, Inc. v. Cook Chemical Co. (8th Cir. 1964), 336 F.2d 110. In that case the United States Court of Appeals for the Eighth Circuit had sustained the validity of a combination patent. The United States Supreme Court also granted certiorari (380 U.S. 949, 85 S.Ct. 1090, 13 L.Ed.2d 968) in the case of Adams v. United States (Ct. of Claims 1964), 330 F.2d 622, in which a combination patent had been valid. It is apparent that the three cases referred to in which certiorari was granted will not be heard and decided until the next term of the United States Supreme Court.[1] Therefore, for the present, this Court will follow the guides and tests as to patentable invention set by the United States Court of Appeals for this Circuit.

In the case of Reiner v. I. Leon Co., supra, 285 F.2d p. 503, the United States Court of Appeals for this Circuit stated:

"* * * It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a 'combination': that is to say, it consists of

---

1. On April 26, 1965, the United States Supreme Court, 380 U.S. 971, 85 S.Ct. 1334, 14 L.Ed.2d 267, sub nom. Brenner v. Manson, granted certiorari in the case of Application of Manson (U.S.Ct. of Customs and Patent Appeals 1964), 333 F.2d 234. The issue in that case is not relevant to any of the issues in the present case.

former elements in a new assemblage. All the constituents may be old, if their new concourse would not 'have been obvious at the time the invention was made to a person having ordinary skill in the art' (§ 103, Title 35). That has been the statutory definition since January 1, 1953. * * *."

The Court goes on to state (pp. 503, 504):

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant? * * * In the case at bar * * * the existing devices at once yielded to Reiner's disclosure; his was an answer to the 'long-felt want.' "

■ In the case of Norman v. Lawrence (1960), 285 F.2d 505, the same Court, in upholding the validity of a combination patent, stated (p. 506): "In spite of the fact that this combination was of the simplest sort, made of two elements that had for many years been used in the industry, no one had thought of combining them." The Court went on to state (p. 506):

" * * * while the standard remains what it is, we can see no escape from measuring invention in cases where all the elements of the

new combination had been long available, (1) by whether the need had long existed and been desired, and (2) whether, when it was eventually contrived, it was widely exploited as a substitute for what had gone before."

In the case of Lyon v. Bausch & Lomb Optical Co., supra, the same Court stated (224 F.2d p. 535):

" * * * The most competent workers in the field had for at least ten years been seeking a hardy, tenacious coating to prevent reflection; there had been a number of attempts, none satisfactory; meanwhile nothing in the implementary arts had been lacking to put the advance into operation; when it appeared, it supplanted the existing practice and occupied substantially the whole field. * * *."

■ On the matter of patentable invention, the United States Court of Appeals for this Circuit and other United States Courts of Appeal have indicated that there are certain objective criteria which may properly be considered on the question of patentable invention. Among those are whether there had been a long-felt need and desire for such a product and when it appeared it met that need and desire and substantially occupied the whole field. Any device which meets and fulfills an existing need and desire is likely to be widely accepted and hence be a commercial success. However, while commercial success of a particular product may be indicative of the fact that the device constituted patentable invention, such may not be the case. The commercial success of a particular product may be due to the stimulation of desire by successful promotion methods or by fine skill and artisanship in its manufacture. In the case of Warner Brothers Co. v. American Lady Corset Co. (1943), 136 F.2d 93, the United States Court of Appeals for this Circuit held the patent involved invalid. The product involved met with commercial success. The Court was of the view that its commercial success was due to ex-

tensive advertising. In the case of Marconi Wireless Co. v. United States (1943), 320 U.S. 1, 63 S.Ct. 1393, 8 L.Ed. 1731, the Court stated (p. 35 of 320 U.S., p. 1409 of 63 S.Ct.): "Commercial success achieved by the later inventor and patentee cannot save his patent from the defense of anticipation by a prior inventor." In the recent case of Beaver Cloth Cutting Machines, Inc. v. H. Maimin Co. (1965), 343 F.2d 442, the United States Court of Appeals for this Circuit stated (p. 444): "Neither commercial success nor a longstanding problem guarantees patentability * *." In the case of Goodyear Co. v. Ray-O-Vac Co. (1944), 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721, the Court upheld the validity of a patent relating to the flashlight battery. In connection therewith, it stated (p. 279 of 321 U.S., p. 595 of 64 S.Ct.): "Once the method was discovered it commended itself to the public as evidenced by marked commercial success."

The Eisbein machine met with marked commercial success. Up to November 30, 1964, the sales in the United States by the plaintiff and its predecessor, the Copease Manufacturing Company, Inc., totalled $44,775,000. The royalty receipts on it in the United States up through October, 1964, amounted to $941,993.14. The total sales of the machine in the United States are indicated to amount to several hundred million dollars. For a number of years following its introduction into the United States, the Eisbein machine substantially occupied the field of photocopy machines for general office work. However, starting in 1961 the Eisbein machine has been subject to severe competition by machines making use of other processes and its dominance of the market has been declining. At the time of the trial the sales of machines licensed under the Eisbein patent represented approximately 75 to 80 per cent of the sales of diffusion transfer photocopy machines in the United States.

█ It is the contention of the defendant that the marked commercial success of the Eisbein patent is attributable to factors other than patentable invention. It asserts that such success was attributable, in part at least, to developments in processing chemicals and papers as well as by improvements in the machines themselves. However, the plaintiff asserts that the commercial success of the machine commenced almost immediately after it was introduced into the United States and prior to such improvements. In that connection the plaintiff points out that it appears shortly following the introduction of the machine into the United States the sales of the New York branch of the Copease Manufacturing Company, Inc. jumped from about $200,000 a year up to about $3,000,000 a year. The defendant contends that the commercial success of the machine was largely attributable to the widespread acceptance and use by the industry of the DTR process. That contention is related to another matter connected with the DTR process. The United States Court of Appeals for this Circuit and other United States Courts of Appeal have indicated that, in passing upon the question of patentable invention, the matter of how long the surrounding and accessory arts disclose the means for solving the particular problem sought to be solved by the claimed invention and the failure of those in the industry to perceive those means should be considered. The foundation of the Eisbein patent was the DTR process. That process was shown in the surrounding and accessory arts. It is the contention of the defendant that such process was only known for such a short time prior to the claimed invention by Eisbein that it cannot be said that those in the industry had any substantial period of time in which to figure out a means to adapt that process for general office use. The defendant points out that at the time the French, Norwegian and Belgian patents were issued for the DTR process those countries were occupied by the Germans and that during a substantial period of time Germany was in the midst of wars. Those situations necessarily restrained the flow of information to the

industry in general as to the DTR process. It was heretofore noted that on June 20, 1944, Gevaert's Andre Rott obtained an United States patent on the DTR process. Therefore, from 1944 information as to the DTR process was available in this country. After the termination of World War II in 1945, the flow of information as to scientific matters from Germany and the formerly occupied countries was no longer impeded. It further appears that, commencing in 1947 at least, the DTR process was the subject of discussion in some of the technical journals. The discovery of the DTR process was, of course, known to the Agfa and Gevaert firms since 1939. While those firms apparently did not have as their objective the manufacture of machines using the DTR process, they were interested in the sale of photographic supplies that would be utilized by machines making use of that process. Further, the need and desirability of a machine that would make use of that process for general office photocopy work was made known to a number of German manufacturers in 1949 who were given full information as to the process. Those manufacturers, so far as it appears, had the materials and facilities available to conduct experiments that might be indicated. It appears that for some considerable time prior to the advent of the Eisbein machine there was need of photocopy machines suitable and acceptable for general office work and that such machines were not available. It further appears that attempts to meet that need had not been successful. It further appears that for some considerable time prior to the advent of the Eisbein machine there existed the possibility of utilizing the DTR process in a machine suitable and acceptable for office photocopy work, but until Eisbein figured out how to do so no one in the field had perceived how that possibility could be converted into reality.

The plaintiff introduced into evidence eight consent decrees. In those decrees the defendants recognized the validity of the Eisbein patent and ackowledged infringement of it. The plaintiff also presented evidence showing that seventeen United States companies had accepted licenses under the Eisbein patent and that thirteen of those licenses are still in effect. The license agreements provide for a royalty of six per cent of the retail sales of the machines. In their briefs the parties made conflicting claims as to the inferences to be drawn from the consent decrees and the licensing agreements. It is the claim of the plaintiff that in addition to manifesting commercial success such decrees and agreements constitute recognition of the validity of the patent by the industry. In the case of Coltman v. Colgate-Palmolive-Peet Co. (7th Cir. 1939), 104 F.2d 508, the patent involved was held invalid for insufficiency of disclosure. The evidence indicated that no royalties had been paid for the use of the product which was the subject matter of the patent. The defendant contended, in substance, that such evidence indicated the lack of recognition of the validity of the patent by the industry and thus cast doubt on the validity of the patent. The Court stated (p. 511):

"* * * The tribute of those engaged in the industries affected, especially when the tribute is evidenced by the payment of substantial royalties, is by far the most persuasive and unimpeachable evidence that can be offered to support the asserted validity of patent claims in litigation. Self interest of the licensee can be relied upon to prevent the payment of royalties, except for discoveries of recognized merit, and the larger and more numerous the royalty payments, the stronger the inference that payment is made only after the licensee has satisfied itself that the invention is meritorious and the claims covering the process or product are valid.

"Although the patent in suit has had no such recognition either from scientists or by the payment of royalties, it by no means follows that

the discovery therein described is lacking in those novel features which support in fact and in law the essential requirements of a valid patent."

The United States Court of Appeals for this Circuit has discussed the matter of the payment of royalties. In the case of Ruben Condenser Co. v. Copeland Refrigeration Corp. (1936), 85 F.2d 537, that Court stated (pp. 540, 541):

" * * * The plaintiffs have indeed received a large income from licenses, but that only means that the licensees have preferred to make their peace rather than fight, and little can be judged from it. Such acquiescence has often been taken as evidence of invention upon preliminary injunction, but the force of the inference is very variable. The reasoning is that if licensees consent to pay tribute, they must believe the disclosure to be patentable, and that this is evidence that it was beyond commonplace contrivance. But when a manufacturer takes a license, it is the resultant of two opposed motives, its cost and the dangers of infringement; and the magnitude of neither factor can be ascertained without knowing that of the other. * * *."

In the case of Warner Bros. Co. v. American Lady Corset Co. (2d Cir. 1943), 136 F.2d 93, the Court, in discussing the matter of royalty paying licensees, stated (p. 94): "Most of the paying licensees are small manufacturers; hence their willingness to pay a royalty of one per cent. [sic] rather than risk expensive litigation deprives their acquiescence of much weight." In the case of Kay Jewelry Co. v. Gruen National Watch Case Co. (6th Cir. 1930), 40 F.2d 600, the plaintiff, in support of the validity of the patent there involved, introduced into evidence a number of consent decrees. The Court stated (p. 604):

" * * * the consent decrees are not convincing. The three defendants were apparently small companies * * *. As pointed out in

John E. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 329, 330, 44 S.Ct. 346, 68 L.Ed. 708, the purchase of peace, when it is known that the patentee or assignee will have to proceed against a large competitor, is often a wise course for the small manufacturer. * * *."

In the present case the royalty payments were six per cent of the retail sales, which is a substantial royalty payment as compared with the one per cent royalty payment under consideration in the case of Warner Bros. Co. v. American Lady Corset Co., supra. In the cases referred to, reference is made to the fact that the licensees were small manufacturers. As to whether the licensees or the defendants in the actions in which consent decrees were entered were large or small manufacturers does not affirmatively appear. The defendant points out that prior to the decision of the United States Court of Appeals for the Seventh Circuit on December 26, 1961, upholding the validity of the Eisbein patent, only six licenses had been accepted and all but two of the licensees had ceased to pay royalties. The defendant also points out that most of the licenses were accepted and most of the consent decrees were entered after that decision. The defendant also points out that prior to the decision of the United States Court of Appeals unholding the validity of the patent the plaintiff itself refused to recognize the Eisbein patent as valid and vigorously asserted its invalidity. It would seem that that decision motivated many manufacturers to accept licenses and to agree to consent decrees. Apparently those manufacturers regarded that decision as being of persuasive significance. Under the circumstances and conditions shown herein, it cannot be said that the particular consent decrees and license agreements are by themselves particularly helpful on the question of the validity of the patent.

It was heretofore noted that the United States Court of Appeals for this Circuit and other United States Courts of Appeal had indicated that certain cri-

teria were proper to be considered in connection with the matter of patentable invention. By way of summary, the views and findings of this Court in that connection will be next stated.

The so-called "wet process" machines for photocopy work in vogue prior to the advent of the Eisbein patent were not suitable or acceptable for general office photocopy work. There was need of and desire for a machine that was suitable and acceptable for such work. For some time prior to the advent of the Eisbein machine, the DTR process was known to the industry. The surrounding circumstances indicated the possibility of utilizing that process in a machine which would meet the need of and desire for a machine which would be suitable and acceptable for general office photocopy work. It was unsuccessfully attempted to devise such a machine. Eisbein's machine successfully met the need of and desire for such a machine. His machine was immediately recognized by the industry as meeting that need and desire and following its advent substantially occupied the field.

In the case of Copease Mfg. Co. v. American Photocopy Equipment Co., supra, involving this same patent, the United States Court of Appeals for the Seventh Circuit stated (298 F.2d p. 782):

"The new and useful result reached by Eisbein was the first practical office photocopying system. By means of his machine, which was compact, lightweight, uncomplicated, inexpensive, capable of operation and maintenance even by inexperienced office personnel, and yet which produced copies of excellent quality and photographic accuracy in only a few seconds' time, he took the diffusion process out of the laboratory and made it available on a practical basis for use in offices. He did this where others failed."

This Court is in agreement with that statement.

This Court finds and holds that the invention embodied by the Eisbein patent is a new combination of old elements which produced a new and improved result and that the invention was not obvious to one having ordinary skill in the art.

In the present case there are nineteen accused machines of which six were made by the Cormac Photocopy Corporation. Cross sectional drawings of the accused machines are in evidence as Plaintiff's Exhibits 32A, 32B and 32C. Some of those machines came into the possession of Anken Chemical and Film Corporation in connection with its transaction with the Cormac Photocopy Corporation. The other thirteen accused machines were manufactured by the Anken Chemical and Film Corporation and its affiliates.

The defendant concedes that each of the nineteen machines has the casing and roller elements disclosed by the Eisbein patent claims. However, it asserts that the various accused machines differ from each other and from the machine shown and disclosed in the patent with respect to their guiding means. Thus, the controversy between the parties as to the matter of infringement relates to the matter of the guiding means.

It was heretofore noted that the machine disclosed by the Eisbein patent provided for guide plates by means of which the positive and negative sheets were separately guided into and through the developer liquid, and following immersion therein they entered rollers which pressed them together and squeezed the greater part of the liquid from them. In claim 1 of the Eisbein patent in relation to the guiding means the following appears:

" * * * guiding means within the casing adapted to guide a plurality of strips in paths from said opening to the point of tangency of the rollers, at least one of said paths extending below the level of the liquid in the casing * * * and said guiding means extending between strips guided therein and including means extending from such

opening to a point adjacent the rolls for engaging and guiding the outsides of strips separated by said last means for preventing contact between the strips at least in the portion of the path between the opening and a point adjacent the level of the liquid."

In claim 5 of the Eisbein patent, in relation to the matter of guiding means, the following appears: " * * * a plurality of spaced fixed substantially parallel guiding means forming at least two superposed curved slide ways * *." In all of the accused machines the lower guide member extends substantially all the way from the inlet opening to the rollers. In this connection it is to be noted that in the case of the two accused machines shown on Plaintiff's Exhibit 32C, which are the Ampto Controller and Cormac 500, the curved bottom of the container functions as the lower guide member. In six of the eight accused machines shown on Plaintiff's Exhibit 32A, the upper guide plate extends substantially to the rollers, while in the other machines shown in this drawing the upper guide is not so long but nevertheless extends upwardly a substantial distance above the lowest point in the path of the sheets to approximately the point at which the sheets emerge from the liquid to pass between the rollers. In the nine accused machines shown on Plaintiff's Exhibit 32B, the upper guide plate extends down only approximately to the lowest point in the path of the sheets. In the accused machines shown on Plaintiff's Exhibit 32C, which are the Ampto Controller and the Cormac 500, the upper guide member consists of a roller near the inlet opening. In all of the accused machines there is a separator bar which extends from the inlet opening down into the liquid so as to prevent contact between the sheets at least in the position of those paths from the inlet opening to beneath the liquid. Because the upper guide in the seventeen machines referred to is shorter than the lower guide and does not extend as far as indicated by the draw-

ing in the Eisbein patent, the defendant contends that the machines are not within the scope of that part of claim 1 of the Eisbein patent which refers to the guide member extending "to a point adjacent the rolls." In that connection it is also the contention of the defendant that since the upper guides in the accused machines are not coextensive with the lower guides they do not constitute "a plurality of * * * parallel guiding means" within the scope of claim 5 of the Eisbein patent.

The differences in the guiding means shown in the accused machines and the machine disclosed by the Eisbein patent in the matter of guiding means are not particularly significant. Those differences do not produce any significant variation in the paths of the sheets through the machines and do not significantly affect the mode of their operation or the results afterward.

In connection with its contention that the accused machines do not infringe on the Eisbein patent, the defendant relies upon certain portions of the patent office history in relation to the patent as shown by the file wrapper. The patent office history of the Eisbein patent is discussed in the opinion of the trial court in the Illinois litigation regarding this patent. Copease Mfg. Co. v. American Photocopy Equipment Co. (D.C.Ill. 1960), 189 F.Supp. 535, 541, 542. It is also discussed by the Appellate Division of the New Jersey Superior Court in the case of American Photocopy Equipment Company v. Ampto, Inc., supra. The substance of the defendant's contentions in that connection is that during the patent office proceedings Eisbein made an amendment to what is now claim 1 of the patent application in regard to the guiding means which estops the plaintiff from now asserting that the accused machines infringe the patent. This Court is of the view that such amendment was not of such a character or nature as to give rise to the claimed estoppel.

It is the finding of this Court that all of the accused machines and the machine

disclosed by the Eisbein patent perform the same function in substantially the same way to achieve the same result.

■ It is the finding and holding of this Court that all of the accused machines infringed the Eisbein patent.

It is the contention of the plaintiff that the judgment in the New Jersey case, American Photocopy Equipment Company v. Ampto, Inc., supra, operated as an estoppel against the defendant in the present action. Because of the holding of this Court on the issue of validity and the issue of infringement, it is not necessary for this Court to pass upon that contention.

It was heretofore noted that when the present action was commenced on October 8, 1957, the sole defendant was the Cormac Photocopy Corporation. In the complaint it was charged with making and selling photocopy machines which infringed the Eisbein patent. Those machines were among the accused machines presently involved herein. On or about March 1, 1961, the Anken Chemical and Film Corporation acquired certain assets of the Cormac Photocopy Corporation. It is the contention of the plaintiff that the Anken Chemical and Film Corporation is liable to it in damages for the infringements of the Eisbein patent by the Cormac Photocopy Corporation up to March 1, 1961. It is the contention of the plaintiff that the Anken Chemical and Film Corporation is under such liability both under the general rules of law relating to corporations and the New York Bulk Sales Act. On February 8, 1961, the Cormac Photocopy Corporation and the Anken Chemical and Film Corporation entered into an agreement for the sale by the former and the purchase by the latter of certain assets of the Cormac Photocopy Corporation. The settlement date was March 1, 1961. The agreement recited that the seller was engaged in the manufacture and sale of photocopy machines and the distribution and sale of photocopy paper and supplies used in connection therewith. The agreement provided, in substance, that the purchaser was purchasing all of the assets of the seller, except 348,000 shares of stock of the Cormac Chemical Corporation. In accordance with the provisions of the agreement, the purchaser transferred to the seller 6,659 shares of its common stock of the agreed value of $350,013.69 and also paid the seller the sum of $49,986.31 in cash. The purchaser agreed to assume the liabilities and obligations of the seller as shown by the balance sheet of the seller at the time of settlement, exclusive of the obligations of the seller with respect to certain debentures. The seller also agreed to assume responsibility for liabilities incurred by the seller in the ordinary course of business between the date of the purchase agreement and the transfer of the assets. The buyer also agreed to assume liability for unspecified liabilities and obligations of the seller up to a maximum of $10,000 in the aggregate. The purchaser assumed all of the liabilities specified in the agreement. It also paid up to $10,000 of the unspecified liabilities and obligations of the seller. The possible liability of the seller for damages for the infringement of the Eisbein patent did not appear on the balance sheet of the seller. That matter was not referred to in the agreement between the parties. The agreement provided that the buyer waived compliance with the provisions of Section 44 of the New York Personal Property Law known as the Bulk Sales Act. At the time of the settlement the stock of the Cormac Chemical Corporation retained by the seller had a market value of about $5,000,000. Subsequently, and during the course of the present litigation, the seller liquidated the shares of stock received by it from the buyer and the Cormac Chemical Corporation shares, distributed all its assets to its stockholders, and then dissolved. The plaintiff asserts that it would be almost an impossible task to pursue the stockholders who received the distribution of the assets and recover back from them the amount of damages owing by the seller for infringements.

The first contention of the plaintiff is stated as follows in its brief: " * * * one who purchases a going business and continues its operation is responsible for all liabilities incurred in the conduct of the business prior to the transfer." In support of its contention that the Anken Chemical and Film Corporation is liable for the infringement of the Eisbein patent by Cormac Photocopy Corporation prior to March 1, 1961, the plaintiff cites the cases of Abeken v. United States (D.C.Mo.1939), 26 F.Supp. 170, and Philadelphia Rubber Works Co. v. U. S. Rubber Reclaiming Works (2d Cir. 1921), 277 F. 171. In the first case cited the situation was that certain parties, without the payment of any consideration, took over and proceeded to operate a professional football franchise previously owned and operated by a corporation. The Court held that they assumed the debts of the corporation. In the second case a corporation purchased all the assets of another corporation and agreed to assume and pay all its debts, obligations and liabilities. The Court held that the purchaser was liable for damages for patent infringement found to be owing in a pending action. It is apparent that the factual situations in those two cases differ from the factual situation in the present case.

In Fletcher, Cyclopedia of Corporations, Volume 6A, p. 681 (Perm. Ed.), it is stated:

"It is the general rule that a going concern may dispose of its assets in good faith, since the trust fund doctrine applies only to insolvent corporations, according to the better rule. In any event, as against a general creditor, a corporation may dispose of its property essential to its continuance in business where it receives the full consideration therefor and has the same available in its treasury for the payment of corporate debts."

It appears to be well settled that a solvent corporation may dispose of its assets in any way it wishes with the consent of its directors and stockholders and that creditors may not complain if the corporation is not thereby rendered insolvent. Fletcher, Cyclopedia of Corporations, supra, footnotes 80 and 81 on pages 681 and 682. It appears to be also well settled that a mere sale of corporate property by one company to another does not make the purchaser liable for the liabilities of the seller not assumed by it. Fletcher, Cyclopedia of Corporations, Volume 6A, pp. 717, 718 (Perm. Ed.). In the present case the Anken Chemical and Film Corporation purchased the assets involved in good faith and paid full and fair consideration for them. It carried out its responsibilities as to the liabilities and obligations assumed by it. The consideration paid for the assets went into the treasury of the Cormac Photocopy Corporation where it was available for the payment of its obligations and liabilities. In addition, the Cormac Photocopy Corporation retained assets having a market value in excess of $5,000,000 available for the payment of its liabilities and obligations. During the long course of the present litigation, the Cormac Photocopy Corporation distributed its assets to its stockholders and was dissolved. The Anken Chemical and Film Corporation was not chargeable with and responsible for those actions on the part of the Cormac Photocopy Corporation. It seems clear that under the general rules of law relating to corporations the Anken Chemical and Film Corporation is not liable for the liabilities of the Cormac Photocopy Corporation for patent infringements occurring prior to March 1, 1961.

The plaintiff, as heretofore noted, also contends that the Anken Chemical and Film Corporation is liable for such infringements under the New York Bulk Sales Act. That Act appears as Section 44 of the New York Personal Property Law. It provides, in part, as follows:

"1. The sale, transfer or assignment in bulk of any part or the whole of a stock of merchandise or of fixtures, or merchandise and of fixtures pertaining to the conducting

of the business of the seller, transferrer or assignor, otherwise than in the ordinary course of trade and in the regular prosecution of said business, shall be void as against the creditors of the seller, transferrer or assignor unless the seller, transferrer or assignor shall at least ten days before the sale make and deliver to the purchaser, transferee or assignee a full and detailed inventory, showing the quantity and, so far as possible with the exercise of reasonable diligence, the cost price to the seller, transferrer or assignor of each article to be included in the sale; and unless the purchaser, transferee or assignee retain said inventory in his possession for at least ninety days thereafter, during which time the same shall be open to inspection by any creditor of the seller, transferrer or assignor, and unless the purchaser, transferee or assignee demand and receive from the seller, transferrer or assignor a written list of names and addresses of the creditors of the seller, transferrer or assignor with the amount of the indebtedness due or owing to each and certified by the seller, transferrer or assignor under oath to be a full, accurate and complete list of his creditors and of his indebtedness; and unless the purchaser, transferee or assignee shall at least ten days before taking possession of such merchandise, fixtures, or merchandise and fixtures, or paying therefor, notify personally or by registered mail every creditor whose name and address are stated in said list, or of which he has knowledge, of the proposed sale and of the price, terms and conditions thereof.

"  *   *   *

"  *   *   *."

The sale agreement recites that the Cormac Photocopy Corporation was a New York corporation having its principal office in New York, New York. The parties had in mind the matter of the New York Bulk Sales Act but the procedures outlined in that Act were not followed. Section 14 of the agreement between the parties provides as follows:

"14. *Bulk Sales Act Compliance.* The Buyer hereby waives compliance by the Seller with the provisions of Section 44 of the New York Personal Property Law (the 'Bulk Sales Act'), in consideration whereof the Seller agrees to and does hereby indemnify and hold harmless the Buyer against any and all claims which may be asserted against the Buyer as the result of the failure of the parties to comply with the provisions of said Statute, except as to liabilities assumed by the Buyer hereunder."

█ It is obvious that the waiver provision would not be effective as against the American Photocopy Equipment Company if it had the status of a creditor within the purview of the Act.

█ At the time of the sale in question, the present action was pending in which claim was being asserted against the Cormac Photocopy Corporation for damages for infringement of the Eisbein patent. The Anken Chemical and Film Corporation knew about that litigation. However, at the time of the sale the Eisbein patent had been held to be invalid by the United States District Court for the Northern District of Illinois. Because of that holding, there were serious doubts in the minds of the parties as to whether the Cormac Photocopy Corporation was liable in damages for the claimed infringements. As heretofore noted, the holding of the United States District Court for the Northern District of Illinois was reversed on appeal. At the time of the sale the matter as to whether damages could be recovered for the claimed infringements was contingent upon it being finally established that the Eisbein patent was valid and that the machines manufactured and sold by the Cormac Photocopy Corporation infringed that patent. The asserted claim for damages was clearly a contingent liability    The

question then is as to its status under the New York Bulk Sales Act. In order for a creditor to come within the protection of that Act, he must be the owner of a debt which must be fixed and capable of being definitely ascertained as an existing obligation liquidated in amount. Borenstein v. Buffalo Hat Co. (1942), 33 N.Y.S.2d 60, 61; Wolfe v. Bellfair Hat Co. (1944), 47 N.Y.S.2d 908. Contingent liabilities are not within the protection of the Act. Adams-Flanigan Co. v. Baselice (1917), 180 App.Div. 342, 167 N.Y.S. 948, 951, affirmed (1920), 228 N.Y. 542, 126 N.E. 898; Hersch v. Schwartz (1944), 47 N.Y.S.2d 63, 65. In an annotation on "Character or class of creditors within contemplation of Bulk Sales Law," 84 A.L.R. 1406, the annotator stated (p. 1414):

> "The cases are in accord in holding that one who has a contingent liability which has not become definite and certain at the time of the transfer is not a creditor within the Bulk Sales Statutes, * * *."

■ It is clear that the asserted claim for damages against the defendant for the infringements of the Eisbein patent by the Cormac Photocopy Corporation was contingent in character, and hence not within the scope of the provisions of the New York Bulk Sales Act.

The foregoing contains the Findings of Fact of this Court. The Conclusions of Law of this Court are as follows:

1. That this Court has jurisdiction of the subject matter of this action and the parties thereto.

2. That the invention disclosed and claimed by the Eisbein United States Patent No. 2,657,618 was not obvious at the time the invention was made to persons having ordinary skill in the art to which the invention pertains.

3. That the patent is a good and valid invention under the Patent Act.

4. That the plaintiff is the owner of that patent.

5. That the patent has been infringed by all nineteen of the accused machines.

6. That the defendants Anken Chemical and Film Corporation, Ampto, Inc., Ampto Equipment Corporation, F. G. Ludwig, Inc., Transcopy, Inc., and Gull Manufacturing Co., Inc. are liable in damages to the plaintiff for all past infringements of the patent by them but not for past infringements of that patent by the Cormac Photocopy Corporation.

7. That the plaintiff is entitled to an injunction restraining the defendants from making, using or selling any of the accused machines or other machines coming within the claims of the patent.

8. That this cause be referred to a special master, later to be appointed by this Court, to ascertain and report to this Court the amount of general damages which have accrued to the plaintiff by reason of the infringements of that patent by the defendants Anken Chemical and Film Corporation, Ampto, Inc., Ampto Equipment Corporation, F. G. Ludwig, Inc., Transcopy, Inc., and Gull Manufacturing Co., Inc.

9. That pending an accounting this Court withholds a determination as to whether an award of punitive damages is justified under Section 284, Title 35, U.S.C.A.

10. That pending an accounting this Court withholds a determination as to whether the plaintiff should be made an allowance of attorney fees under Section 285, Title 35, U.S.C.A.

11. That the determination as to whether the plaintiff is entitled to an award of punitive damages and an allowance of attorney fees will be made by this Court at a hearing to be held following the report of the special master as to general damages.

12. That the plaintiff is entitled to recover its taxable costs and taxable disbursements.

13. That this Court resumes jurisdiction of this cause until final judgment is entered herein.

**1016**

It is hereby ordered that an interlocutory judgment be entered in accordance with the foregoing Findings of Fact and Conclusions of Law.