AMERICAN PHOTOCOPY EQUIPMENT COMPANY, Plaintiff, Counter-defendant,

v.

ROVICO, INC., Defendant, Counter-plaintiff.

No. 62 C 2080.

United States District Court
N. D. Illinois, E. D.
June 20, 1966.

See also, 7 Cir., 359 F.2d 745.

Albert E. Jenner and John J. Crown, Raymond, Mayer, Jenner & Block, Chicago, Ill., for plaintiff.

Samuel J. Stoll, New York City, for defendant.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

Memorandum Opinion Embodying Findings of Fact and Conclusions of Law.

This case came on for trial on October 12, 1965. Following the closing of evidence seven days later, the parties commenced submission of numerous briefs, exhibits, letter and proposed findings of fact. Additional briefs were filed thereafter with respect to the March 3, 1966 ruling of the Seventh Circuit Court of Appeals reversing the issuance of a preliminary injunction herein. We have fully considered the evidence and supplemental papers filed to date, and hereby render the following opinion based thereon:

This is an infringement action arising under U. S. Patent No. 2,657,618 issued November 3, 1953 to one Dr. Walter Eisbein covering a machine constructed to develop photocopies by means of the diffusion-transfer-reversal process (hereinafter, DTR). Claims 1, 5, and 11 of said patent are in suit. Plaintiff herein is the American Photocopy Equipment Company, (APECO), an Illinois corporation, engaged in the manufacture and sale of office photocopying machines and supplies. Defendant Rovico, Inc., is a New Jersey corporation engaged, as a competing concern, in similar activities.

The Eisbein Patent at issue has been litigated extensively, primarily in Copease Mfg. Co. v. APECO, (7th Cir., 1961) 298 F.2d 772; Copease and APECO v. Cormac Photocopy Corp. and Anken Chemical and Film Corp., (D.C.N.Y., 1965) 242 F.Supp. 993; and APECO v. Ampto, Inc., (N.J.App.Div., 1964) 140 U.S.P.Q. 616. In *Copease* and *Anken*, infringement suits brought in the Seventh and Second Circuits, respectively, the Courts independently held the Eisbein patent valid. Indeed, in *Anken*, the Court found that all nineteen of the Anken machines were infringing plaintiff's patent, including the "Anken 12" and "Anken 27" DTR Processors, which were supplied by the present defendant and which are among the machines accused herein. It should be noted further that after the Court's ruling in the Seventh Circuit litigation, APECO, plaintiff herein, and defendant there, purchased the entire capital stock of Copease Mfg. Co., for the sum of $5,450,000 (Stip. of Oct. 25, 1965), including the Eisbein patent and licenses previously granted thereunder. APECO thus assumed prosecution of the remaining suits.

The DTR process involves two basic steps—exposure and development. In essence, a photosensitive emulsion on a

negative sheet is initially exposed to the original sheet to be copied. Thereafter, the exposed grains of silver halide on the negative are reduced to metallic silver, and the unexposed grains are diffused through the emulsion of the negative and transferred to that of a non-photosensitive positive sheet containing nucleating agents which attract these unexposed grains and catalyze their reduction to metallic silver to form a positive image. (Tr. pp. 257–262; Copease v. APECO, supra, 298 F.2d at p. 774.

The Eisbein patent at issue discloses and claims a machine for performing the development stage alone (Tr. pp. 22, 45–46, 56–57). In essence, the machine includes three elements:

a) a casing in which developer liquid is contained at a given level, said casing having an inlet opening above the liquid level for the insertion of sheets to be treated;

b) a pair of rollers contacting one another along a line located above the liquid level which press the emulsions of the two sheets together for transfer of unexposed silver halide particles, remove excess liquid from the sheets, and convey the adhering sheets out of the machine; and

c) guide means for conveying the sheets on curved paths from the inlet opening beneath the level of the liquid, and then upward to the rollers, and separating same until immersion into the liquid, so that the emulsions on the inner faces are wetted fully before pressing by the rollers (Tr. pp. 265–270).

This Court must decide three ultimate questions—whether the Eisbein patent is valid—whether the claims of said patent cover the machines manufactured and sold by defendant, and whether plaintiff through its licensing procedure, has violated the anti-trust laws and thus should be precluded from enforcing the patent in suit. These three areas may be entitled, for the purposes of this opinion, as *Validity, Infringement,* and *Misuse.*

## I *Validity*

We are satisfied, initially, that the finding of validity by the Seventh Circuit Court of Appeals in Copease v. APECO, supra, is binding upon this Court in the absence of persuasive new evidence of invalidity, Cold Metal Process Co. v. E. W. Bliss Co. (6th Cir., 1960) 285 F.2d 231, 244; Lehman Co. of America v. Appleton Toy & Furniture Co. (7th Cir., 1945) 148 F.2d 988, 989–990, despite the difference in parties. In addition, where the prior decision of validity and infringement is in a different circuit, as *Anken,* supra, it is to be considered "strongly persuasive." Cold Metal Process Co. et al. v. Republic Steel Corp. (6th Cir., 1956) 233 F.2d 828, 837; Minn. Min. & Mfg. Co. v. Permacel-LePage's Inc., (D.C.Ill., 1963) 222 F.Supp. 540, 547. We are of the opinion that defendant herein has failed to introduce any evidence which substantially contradicts the *Copease* findings in the Seventh Circuit, and/or "strongly persuades" this Court that the patent in issue is invalid.

In support of its assertions of invalidity, defendant relies on four items of prior art, the Agfa machine, described in French Patent No. 879,995 (Def. Ex. Y–8) and in a drawing sent by Agfa to four designing companies (Def. Ex. Y–4a); Page 83 of Von Biehler's Handbuch der Fotokopie (Def. Ex. W); Edwards U. S. Patent No. 381,226 (Def. Ex. C–1); and Pollak U. S. Patent No. 717,021 (Def. Ex. C–1). These four references have all been previously considered in earlier decisions and found not to invalidate the Eisbein patent.

The Agfa machine, the only reference relating to the DTR Process, was considered by the U. S. Patent Office before it granted the Eisbein patent (Def. Ex. A, p. 32), by the Seventh Circuit Court of Appeals in *Copease* (298 F.2d at pp. 774, 777, 778), and by the District Court for the Southern District of New York in *Anken* (242 F.Supp. at pp. 996, 1000–1001), and found to anticipate said patent. We find no justification in the evidence before us to differ.

The Agfa machine which includes a large rotatable drum and a series of endless belts supported on three or four rollers, unlike the Eisbein invention, was found to be "unfit for commercial use," due to its large size, large liquid capacity, and frequent need for adjustment. (298 F.2d 774–775, 777–778). The structural differences between the Agfa and Eisbein patents, detailed by the Court of Appeals in *Copease* (298 F.2d 777–778), were demonstrated here as well, by plaintiff's expert witness, Mr. Hill. (Tr. pp. 1109–1112). In addition to the aforesaid crucial distinction between the contacting rollers approach of Eisbein, and the drum and endless belt device claimed by Agfa, the latter clearly performed a different sequence of operations from that performed by the Eisbein machine. That is, while the sheets are held together under pressure during most of the immersion process in the Agfa device, Eisbein proposed that they move through the liquid separately (298 F.2d 777–778) and not be pressed together until emergence. In this manner, Eisbein prevented blurring of the image from slippage (Tr. pp. 1105–1106), and wrinkling from expansion, (Tr. pp. 811–812).

■ Similarly, defendant can get little support from the Von Biehler publication. While this item is the only reference that was not before the Court in *Copease*, it was cited and discussed in the *Anken* opinion (242 F.Supp. 1003). It is apparent that the Von Biehler machine was intended to be used in developing a single sheet of photographic paper. Defendant, however, suggests that the machine might be used in the DTR Process, by bypassing the input rollers. As plaintiff's expert witness, Hill, demonstrated, however, defendant's theory would require that the two sheets be inserted perpendicularly to the bottom guide or tray, which might well lead to buckling, (Tr. pp. 1118–1121). Further, it is apparent that defendant's proposed method would require extremely difficult manipulation, and clearly was not suggested by Von Biehler. Defendant cannot modify Von Biehler's device in the light of what Eisbein subsequently disclosed. Such modification, when the maker did not intend same, cannot be said to raise the original device to the status of an invalidating anticipation of the patent in suit. Young Radiator Co. v. Modine Mfg. Co., (7th Cir., 1931) 55 F.2d 545, 547. The Eisbein Claims, in the opinion of this Court, do not read on the Von Biehler disclosure, (Tr. pp. 903 et seq.).

The Edwards patents, considered by the Seventh Circuit Court of Appeals in *Copease,* and dismissed (298 F.2d 779), relate to massive machines used for galvanizing or tin plating steel sheets (Tr. p. 968), and could not be utilized in the DTR development process. That is, even if the apparatus were scaled down, it is apparent that the guide means would support only the lateral edges of the sheets (Tr. pp. 1122–1123). While this was necessary for the treating of metal sheets (Tr. pp. 1125–1128), it would be manifestly improper for feeding limp sheets of wet paper which would not be adequately supported. (298 F.2d 779).

Finally, we reach the Pollak patent which was before both the *Copease* and *Anken* Courts. As the Court of Appeals for the Seventh Circuit concluded, this patent does not disclose the feeding of two sheets simultaneously through a liquid as specifically recited in the Eisbein Claims, it being intended for use in development of a single sheet of photographic film or paper. Further, Pollak discloses no means for separating sheets until they have been wet by the liquid as called for in Eisbein's Claims. (298 F.2d 778; 242 F.Supp. 1001). The correctness of these prior findings was corroborated by the evidence received herein (Tr. pp. 1055–1058).

■ It is thus clear that there has been no "anticipation" of the claimed invention by any single disclosure made in defendant's proposed prior art, (Sec. 102, Title 35, U.S.C.). Thus, the patent must be considered valid if,—pursuant to Sec. 103, Title 35, U.S.C., and the decision of the U. S. Supreme Court in Gra-

ham et al. v. John Deere Etc. et al., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (Dec. Feb. 21, 1966),—the differences between the patented subject matter and the prior art are such that the subject matter as a whole would not have been "obvious" at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. This Court is of the opinion that the instant patent is not defeated by "obviousness." That is, we are convinced that the Seventh Circuit Court of Appeals applied the traditionally proper statutory and judicial tests of patentability codified in Section 103, by relying on Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), and Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683 (1850), and that the decision of the U. S. Supreme Court in *John Deere*, supra, did not affect the correctness of the *Copease* result.

As did the *Copease* Court, we have initially looked to the scope of the prior art, and have specified the differences between that development and the claims at issue. The level of ordinary skill in the pertinent art at the time the invention was made, has also been considered by this Court with regard to the 1939 invention of the DTR Process by Agfa and Gavaert (Tr. pp. 253–255; 298 F.2d 773) and the repeated failure thereafter to develop a practical mode of operation for office use (298 F.2d 774, 775–776; 242 F.Supp. 996–997, 1008, 1010).

After consideration of the evidence offered herein, we must conclude both on the basis of the *Copease* precedent, and our own independent analysis, that the invention at issue could not have been "obvious" within the meaning of Section 103.

Defendant further contends that the patent is invalid because the Claims are "broader than the invention" in that Eisbein disclosed a machine that requires all of the sheets to be kept separate until they reach the rollers, while his claims are broad enough to cover machines in which the separator guide plate is cut so short that it only separates the sheets until they have entered the processing liquid, (Tr. pp. 464–466).

Without reaching the question of whether this same argument was considered by the New Jersey Court in *Ampto*, supra, a fact never clarified at trial, we must conclude that defendant's argument cannot stand.

■ It is our understanding that the "Claims" of a patent application can never be broader than the "invention," as the latter is in fact defined by the former. That is, broadening of Claims may increase the risk of anticipation by prior art, by expanding the invention, or make a prior use defense more available, but does not of itself cause invalidity. Binks Mfg. Co. v. Ransburg Electro-Coating Corp. (7th Cir., 1960) 281 F.2d 252, 256; Aerosol Research Co. v. Scovill Mfg. Co., (D.C.Ill., 1963) 137 U.S.P.Q. 701, 724. Even if defendant's argument is to be interpreted as a contention that claims broader than the specifications and drawings cause invalidity, it must fail. Under Section 112, Title 35, U.S.C., the inventor is required to set forth the *best mode* contemplated to carry out the invention. Thus the claims are, by necessity, always broader than the specifications and drawings. If defendant's arguments were valid, plaintiff would have to submit innumerable drawings of devices covering every conceivable length, of center separator guide plate. This clearly was not envisioned by Section 112, which calls only for specifications describing the "best mode," rather than "all modes," or all possible embodiments of the invention. There is no inconsistency between the claims herein and the specifications. Thus, defendant's position is unsound.

We have duly considered defendant's further arguments, and conclude that the term "slideways" appearing in Claim 5 clearly relates to the paths sided by the guiding means,—that Claim 1 is not so vague and indefinite as to be unpatentable, and that the Eisbein patent Claims were narrowed by amendment during the

prosecution of the patent claims and not broadened.

Accordingly, we must hold that the Eisbein patent is good and valid in law.

## II *Infringement*

Defendant herein has made and sold six different models of photocopying machines (Pl. Ex. 13), all of which are charged to infringe:

1) The "Fotomate" (Discontinued Model) (Pl. Ex. 4, 7);

2) The "Fotomate" 10-inch Deluxe (Pl. Ex. 8, 17A, 17B, 17C);

3) The "Fotomate" 15-inch Deluxe;

4) The 12-inch Processor (Discontinued Model) (Pl. Ex. 18, 18A, 18B);

5) The 12-inch Processor (Present Model) (Pl. Ex. 9); and

6) The 27-inch Processor (Pl. Ex. 19, 19A, 19B).

These six devices can be classified into three categories for purposes of discussion: (a) The three Fotomate models which are complete photocopying machines including both the unpatented exposure machinery and the developing apparatus, and which differ only in the shape of the housing and in width; (b) the current 12 and 27-inch Processors (Items 5 and 6 above) which develop only, and are identical except for width; and (c) the discontinued original 12-inch processor model. The constructions referred to in Items (b) and (c) were directly involved in the New York *Anken* litigation as the "Anken 27" and "Anken 12" machines respectively (Pl. Ex. 11) and were found to infringe the Eisbein patent.

There was ample evidence offered at the trial of this cause to demonstrate that each of the three classes of accused machines falls within the language of the Claims at issue, 1, 5, and 11. (See Tr. pp. 298–308; 316–322; 322–324).

Apparently recognizing this, defendant contests the literal application of only three portions of the Claims to its machines, to wit:

1) " * * * means extending from such opening (inlet) to a point adjacent the rolls for engaging and guiding the outsides of strips * * *" (Claim 1);

2) " * * * substantially parallel guiding means * * * (Claim 5); and

3) " * * * at least two superposed curved slideways * * * leading to the set of rollers." (Claim 5).

In each of the three accused constructions the lower guide extends all the way from the inlet opening to the rollers (Tr. pp. 308, 375) and in the discontinued 12″ Processor (Category "C"), the upper guide extends full length, as well, (Tr. pp. 306–307). In the "b" category, current processors, the upper plate extends downward to the lowest point of immersion, and half the distance from that point up to the rollers, and in the Fotomate machines (Category "a"), it extends all the way down, and one-fifth of the distance upward.

In *Anken*, the New York District Court held that the language in Claim 1 was satisfied by machines having even shorter guide means than those present in the Rovico constructions (242 F.Supp. 1011). The New Jersey Court, in *Ampto*, supra, faced with machines with guides extending only to the low point of travel, and not upward, held said devices to infringe Claim 1, but based its decision on the "doctrine of equivalents," holding that the upper guides there, although shorter, performed their function in substantially the same manner as the Eisbein guides, with no difference in result. (140 U.S.P.Q. 626–629).

While we may rest our decision on either theory alternatively, and do so, we lean more to the *Anken* view, concluding that all three constructions containing lower guide means running the whole route from inlet to rollers, and upper means running 100, 75 and 60 percent respectively, read literally on the language of Claim 1 at issue. That is, in all three machines, guide means of some nature conduct the two sheets the entire distance from the opening to the rollers, which is all that is required. The shortening of the upper guide alone does not

produce any significant variation in the paths of the sheets which naturally follow the lower guide curvature anyway, and does not affect the mode of operation of the machine or results obtained, (Tr. pp. 308–313). The full extension of the lower guide means to the rollers, after the upper plates have directed the sheets downward satisfies the language at issues.

We are further satisfied from the evidence and exhibits presented to this Court that the guiding means in each of the accused machines are "substantially parallel" within the meaning of Claim 5. It is apparent that in all three of the categories set forth above, the sheets are inserted simultaneously in the inlet opening and move in generally parallel paths through the solution to the rollers where they are pressed together. The sheets achieve this "parallel" trip by means of the plates which extend in the same general direction and serve as guides. While the guide plates are not perfectly straight, and are not at all times equidistant from each other, it must be remembered that the claims do not call for absolute parallelism, but only for a "substantial" degree thereof. The guide means follow the same general downward curve and maintain a substantially similar spatial distance between each other at all points, keeping both inserted sheets immersed in the liquid, and then guiding them upward to the rollers. We believe that such constructions were intended to fall within Claim 5, as differentiated from those machines in which the two sheets are inserted into opposite sides and move toward rollers located at the center of the machine (Tr. pp. 1090–1091). As the New York and New Jersey Courts which considered this precise question, we find that infringement is present. (See 140 U.S.P.Q. 629–630; 242 F.Supp. 1011).

Finally, it is clear to this Court that each of the accused machines contains at least two superposed curved slideways *leading* to the set of rollers. While the separator plates do not *extend* all the way to the rollers, as defendant argues,

they do *lead*, or "direct" the sheets to the rollers. As the *Ampto* Court concluded at pp. 630–631 (140 U.S.P.Q.), this is all that is demanded by Claim 5, slideways which conduct the photographic sheets to the rollers on the course described in the Claims.

In addition to the literal reading on the Claims just discussed, we find it abundantly clear that each of the Claims would be infringed under the "doctrine of equivalents" if such literal readability were absent. Indeed, counsel for defendant conceded at trial that the patented apparatus and the accused machines "perform substantially the same function in substantially the same way (to achieve) substantially the same result." (Tr. pp. 464–465),—the traditionally accepted definition of an equivalent device. See Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 607–608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

We cannot accept defendant's further argument that the Eisbein Claims can not read on the accused Rovico machines because, as amended, the Claims have to be given the same meaning they had before amendment, under the doctrine of file wrapper estoppel. File estoppel, which prevents a patentee from seeking the benefit of a rejected claim once he has acquiesced to that rejection by amendment, arises only when an amendment has been filed to overcome a rejection based on prior art. Ekco Products Co., Inc. v. Chicago Metallic Mfg. Co., (7th Cir., 1965) 347 F.2d 453, 454. In the instant case, the amendment of claims which ultimately issued as Claims 1 and 5 were not filed to avoid the Agfa prior art reference, and indeed, in this Court's opinion, the original claims did not read on the Agfa machine. We therefore must reject defendant's argument as did the Court of Appeals in *Copease.*

Accordingly, we shall hold that defendant has infringed Claims 1, 5, and 11 of the Eisbein patent by making and selling each of the aforementioned six accused models.

### III *Misuse*

Defendant finally contends that the Eisbein patent in suit is unenforceable because of its unlawful licensing use by the plaintiff in violation of the anti-trust laws of the United States, whereby (a) plaintiff derives its royalties from unpatented machines, and (b) plaintiff charges price-fixing royalties based on retail list prices. That is, defendant asserts that by its licensing policy of charging a 6 per cent royalty on the retail selling price of all machines manufactured by licensees utilizing the Eisbein patent, APECO has, in effect, illegally charged royalties on the unpatented exposure devices contained therein, and further, has unlawfully set the minimum price at which photocopying machines produced thereunder can be sold. In support of the latter allegation, defendant contends that the 6 per cent retail based royalty referred to above, is actually 12 per cent of the manufacturing cost of the whole machine, and 24 per cent of the patented portion thereof (Tr. pp. 65–66).

We will not accept this argument. The evidence adduced at trial clearly demonstrates that APECO acquired the Eisbein patent after it was adjudged an infringer thereof in the *Copease* litigation, and continued the licensing policy entered into by its predecessor,—a uniform charge of 6 per cent of the retail sales of machines embodying the patented invention. It is further apparent that APECO paid $5,450,000 to purchase the patent, which figure, less $924,000 it has received in royalties and damages from infringers, totals $4,526,000, or 12½ per cent of its total DTR sales in the United States. Under defendant's reasoning, plaintiff has thus paid *50 per cent* of its manufacturing cost of the patented device to Copease for the right to manufacture and sell machines which embody the Eisbein patent (Post Trial Stip., Par. 1, Exs. A & B). In addition, it is clear that the royalties charged licensees are payable on the sales of machines alone, and not on paper and chemical supplies which flow from the machine sales. These sales gross two to three times more income for licensees than is produced by the machines alone (Tr. pp. 1243–1244). Further, the evidence clearly demonstrates that APECO has charged a uniform royalty to all licensees so as not to grant to any recipient, any competitive advantage (Tr. p. 1225), that prices of DTR machines have *declined* since 1962 when APECO acquired the Eisbein patent (Tr. pp. 1245–46, 1218), and that DTR process machines account for only 10 per cent of the photocopying machine market, of which plaintiff's sales amount to 15 per cent, or 1½ per cent of the total, (Tr. pp. 1249, 1247; Post Trial Stip. Ex. A).

 From these facts, we must conclude that APECO has not misused its patent by engaging in licensing practices which run afoul of the anti-trust laws, as charged by defendant.

 We cannot assume that there exist restrictions against "unreasonably high royalties," absent any proof of favoritism or conspiracy to fix prices, neither of which has been inferred, much less proven herein. Where a patentee is certainly free not to license at all, we fail to see how competition is restrained by charging high royalties. Indeed, such licensing, if not beyond the scope of the patent grant, should be encouraged under anti-trust principles, as an alternative to monopoly, which would otherwise be present. The free competitive market place has built-in controls such as supply and demands to limit the royalties charged by a prospective licensor. There is no indication that further controls are justified. Indeed, the case law is uncontroverted to the effect that it is not a violation of the anti-trust laws for a patentee to grant a license under his patent *for any royalty* or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure. This, of course, is not to say that the patentee is free to expand his statutory monopoly, as where royalties are to be paid after the patent has expired. United States v. General Elec-

tric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926); United States v. Huck (D.C.Mich., 1964) 227 F.Supp. 791, 803, affd. 382 U.S. 197, 86 S.Ct. 385, 15 L.Ed.2d 268 (1965).

Even assuming however, that a royalty may be unlawful because of its magnitude, and we do not adopt that position, we cannot consider the 6–12–24 per cent royalty charged herein to be oppressive. See Malleable Iron Range Co. v. Lee, (7th Cir., 1920) 263 F. 896, cert. den. 251 U.S. 562, 40 S.Ct. 342, 64 L.Ed. 415 (1920), approving a royalty of 26%; Temco Electric Motor Co. v. K. W. Ignition Co., (6th Cir., 1922) 283 F. 873, 879, cert. den. 260 U.S. 746, 43 S.Ct. 247 (1923), approving a 23½% royalty; National Rejectors v. ABT Mfg. Corp. (7th Cir., 1951) 188 F.2d 706, 710, cert. den. 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626 (1951). Where the evidence is clear that the licensor itself has paid an amount equal to twice the royalty charged for the same rights of manufacture and sale, said licensor should not be precluded from assessing the rates charged. The licensees have more than made up these charges through sales of paper and chemicals to be used with their machines, which in effect bring their assessment down to less than 2 per cent of total sales arising out of their licenses. Further, and of great importance, it has been proved that the retail selling price of the DTR Processors has *declined* since APECO assumed ownership of the Eisbein patent, and that APECO's share of the photocopy market has dropped drastically. While it is axiomatic that any additional cost of manufacture will affect price or profit and thus, that any royalty will have a similar effect, it is noteworthy that here, the alleged "oppressive" royalty has been absorbed by the licensees, and that prices on the retail level have been reduced.

■ We must, therefore, conclude that there is no evidence whatsoever in the trial record to prove that the royalties charged by plaintiff have tended to *unlawfully* fix prices, extend a monopoly, or restrain competition.

■ Similarly, we can find no rationale to support defendant's argument relating to "tying." While APECO's royalties are charged as a percentage of the retail selling price of the whole photocopying machine, developing and exposure devices alike, it would seem illogical to this Court to conclude that APECO thus expanded its patent monopoly to include a non-patented device. By defendant's own reasoning, with regard to the alleged exorbitant royalty rate, licensees are paying 24 per cent of the manufacturing cost of the patented device alone. This is what was bargained for in dollars and cents, and this is what was received, a royalty payable on the patented device alone, but computed on the price of the whole machine. Whether the royalty is stated as 6 per cent of the retail price of the entire machine, including the non-patented device, or 12 per cent of the retail price of the Eisbein apparatus alone is not essential, for the result is precisely the same * * * a specified charge for the right to manufacture under the patent at issue. The means of computing same should be of no import. As the U. S. District Court for the Northern District of Ohio stated in Ohio Citizens Trust Co. v. Air-Way Elec. Appliance Corp., (D.C.Ohio, 1944) 56 F.Supp. 1010:

> "No case has been cited, and we have been able to find none, holding that the amount of royalty to be paid under a license agreement may not be measured by a rate or percentage calculated upon the sales of completed devices, parts and accessories, contemplated to be manufactured under the patents involved, irrespective of whether such sales include items which do not come within the claims of the licensed patents."

See also: American Optical Co. v. N. J. Optical Co., (D.C.Mass., 1944) 58 F. Supp. 601. Indeed, the Seventh Circuit Court of Appeals, in affirming Judge Win Knoch, then of the District Court, stated in Hazeltine Research v. Avco Mfg. Corp., (7th Cir., 1955) 227 F.2d

137, cert. den. 350 U.S. 987, 76 S.Ct. 474, 100 L.Ed. 854:

"* * * royalties are payable on total production of radio and television receivers, regardless of the extent to which the licensee uses any Hazeltine patent." (227 F.2d at p. 147)

Accord: Automatic Radio Co. v. Hazeltine, 339 U.S. 827, 833, 836 (1950); Hazeltine Research v. Admiral Corp., (7th Cir., 1950) 183 F.2d 953. In the latter case, the Court approved a royalty based upon an entire television broadcast receiver even though the patent was directed to a small feature thereof.

"There are two provisions of Hazeltine's license agreements principally relied upon * * * (1) the exaction of royalty on entirely unpatented products made by plaintiff's licensees * * *.

"It is our conclusion that the misuse charge made by Admiral must be rejected."

Defendant finally argues that under the March 3, 1966 ruling of the Seventh Circuit Court of Appeals, reversing the issuance of a preliminary injunction herein, that plaintiff may not enforce the patent at issue. We do not agree. That decision, as we read it, was limited to the state of the record as it stood on June 11, 1965, including Rovico's allegations of price fixing, Robert Vinci's affidavit in support thereof, and plaintiff's incomplete denial, the opinion being based on "defendant's *undisputed* showing of an exorbitant, oppressive royalty, involving the bulk of the industry, with a corresponding raise of the manufacturer's and retailer's selling prices of the licensed machines."

That "showing" is no longer undisputed. This Court is satisfied from the evidence introduced at trial that the royalty at issue is neither exorbitant nor oppressive, that the bulk of the office photocopying industry is not involved, and that the selling prices of the licensed machines have indeed declined. The evidence clearly demonstrates that there has been no price-fixing herein with the exception of that necessarily incident to any royalty charge; that no illegal "tying" is present, and that no restraint on competition has resulted from APECO's licensing policies.

The Court of Appeals instructed this Court to proceed to trial of this case on the merits. We have done so, and have concluded on the evidence, that plaintiff is not guilty of patent misuse as charged.

All additional arguments made by defendant, and not discussed herein, have been duly considered and denied.

Accordingly, it is the judgment of this Court that plaintiff, pursuant to Sections 283, 284, Title 35, U.S.C., is entitled to (1) a permanent injunction restraining defendant from making, using and/or selling any of the accused machines; (2) damages adequate to compensate for defendant's past infringement, and (3) taxable costs.

Upon detailed consideration of the evidence adduced, briefed arguments, and surrounding circumstances, we further hold that defendant should not be held in contempt of court for the alleged sale of infringing photocopying machines after entry of the June 14, 1965 preliminary injunction by this Court, and that no award of treble damages and attorneys' fees pursuant to Section 285, Title 35, U.S.C. shall be entered.